LAW OFFICES OF
**WALKUP, MELODIA, KELLY & SCHOENBERGER**
A PROFESSIONAL CORPORATION

650 CALIFORNIA STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94108-2615
(415) 981-7210

KHALDOUN A. BAGHDADI (State Bar #190111)
kbaghdadi@walkuplawoffice.com
SARA M. PETERS (State Bar #260610)
speters@walkuplawoffice.com
**ATTORNEYS FOR PLAINTIFFS**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD EIDSON,<br><br>               Plaintiffs,<br><br>               v.<br><br>MEDTRONIC, INC; MEDTRONIC<br>SOFAMOR DANEK USA, INC.,<br><br>               Defendants. | Case No. CV 13 2049 LHK<br>[Related Case No. 13-cv-01502]<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES**<br>  (1)  Fraudulent Misrepresentation and Fraud in the Inducement;<br>  (2)  Strict Products Liability – Failure to Warn;<br>  (3)  Negligent Misrepresentation;<br>  (4)  Negligent Failure to Warn; and<br>  (5)  Punitive Damages.<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Richard Eidson, by and through his counsel, allege as follows:

## INTRODUCTION

1.      This case involves a spinal surgery in which a bio-engineered bone graft device known as the INFUSE® Bone Graft ("INFUSE®") was implanted in Plaintiff Richard Eidson in an off-label manner.

2.      INFUSE® is a bio-engineered liquid bone growth stimulator classified by the FDA as a medical device.  It was designed, manufactured and marketed by a division of Medtronic, Inc. known as Medtronic Sofamor Danek USA, Inc. ("MEDTRONIC" or "MEDTRONIC

1  Defendants").  INFUSE® is used in spinal fusion surgeries, and its purpose is to stimulate bone

2  growth, obviating the necessity of harvesting bone from the patient's own hip.

3      3.      This case involves a spinal fusion surgery in which INFUSE® was used in an off-

4  label (i.e. not approved by the FDA) manner.

5      4.      INFUSE® is approved by the FDA only to be marketed and promoted for spinal

6  fusion procedures in skeletally mature patients with degenerative disc disease at one level from

7  L4-S1.  INFUSE® is only approved to be marketed and promoted for surgery performed through

8  the abdomen (anterior approach), and only when used in combination with an "LT-Cage," a

9  hollow metal calendar that is used to insert the INFUSE® into the spine.  All other uses are off-

10  label uses.

11      5.      Despite this lack of FDA approval, and the FDA's explicit concerns about the

12  dangers to patients of off-label uses of INFUSE®, the product was improperly promoted by

13  MEDTRONIC for off-label use in posterior approach lumbar spine fusions, for cervical spine

14  fusions, at multiple levels, in patients with complaints other than degenerative disc disease, and

15  without an LT-Cage.

16      6.      Patients' spine surgeons, including Plaintiff's surgeon, were persuaded by

17  MEDTRONIC, by the research MEDTRONIC funded, and by MEDTRONIC's consultant

18  "opinion leaders," who are paid physician promoters, to expand their use of INFUSE® for off-

19  label uses.

20      7.      When INFUSE® is used off-label, it can cause severe injuries to the patient,

21  including INFUSE®-induced bone overgrowth, cyst formation, extreme inflammatory reactions,

22  chronic radiculitis, retrograde ejaculation, sterility, osteolysis (bone resorption), displacement or

23  migration of the spacer cage, and other complications that often cause permanent disability or

24  necessitate risky, painful, and costly revision surgeries.

25      8.      Notwithstanding overwhelming and substantial evidence (including data from

26  MEDTRONIC-sponsored studies, and from reports to MEDTRONIC) demonstrating these

27  increased risks of adverse reactions from off-label use of INFUSE®, MEDTRONIC recklessly

28  and/or intentionally misrepresented, minimized, downplayed, disregarded, and/or completely

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

2

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

1    omitted these risks while promoting INFUSE® to spine surgeons for off-label uses. In fact,

2    MEDTRONIC promoted to spine surgeons and patients the use of the product in dangerous off-

3    label procedures, thereby demonstrating a conscious disregard for the health and safety of spinal

4    fusion patients such as the Plaintiff.

5         9.      Moreover, the actual rate of incidence of serious side effects from off-label use of

6    INFUSE® is, in fact, much greater than that disclosed by MEDTRONIC to spine surgeons and

7    patients. With respect to the off-label approaches, MEDTRONIC failed to accurately disclose the

8    significant off-label risks which it knew of or should have known.

9         10.     Because of MEDTRONIC's wrongful conduct in actively and illegally promoting

10   the off-label uses of INFUSE®, and because of MEDTRONIC's additional wrongful conduct in

11   minimizing, concealing, or downplaying the true risks of these non-FDA approved off-label uses

12   of its product INFUSE®, thousands of spine patients, including Plaintiff, underwent surgeries

13   without knowing the true risks inherent in the off-label use of INFUSE®.

14        11.     These patients and their physicians relied on MEDTRONIC's false and misleading

15   statements of material fact including statements and publications by MEDTRONIC's "opinion

16   leaders," or "thought leaders" who are paid physician promoters of INFUSE® and MEDTRONIC

17   sales representatives.  MEDTRONIC orchestrated a marketing campaign from at least 2002 to the

18   present to persuade spine surgeons to use INFUSE® in dangerous off-label uses in the spine.

19   Indeed, absent MEDTRONIC's extensive off-label promotion campaign, physicians, such as the

20   Plaintiff's spine surgeon, would never have performed these risky off-label procedures.

21        12.     Plaintiff Richard Eidson underwent spinal surgery, wherein INFUSE® was

22   implanted on November 11, 2008, and suffered injuries and damages, including but not limited to

23   cyst formation, bone resorption, and ectopic bone growth, requiring additional surgeries, and

24   resulting in past and future medical expenses, wage loss, and loss of earning capacity as a result of

25   having INFUSE® implanted.

26                                   **THE PARTIES**

27        13.     Plaintiff Richard Eidson is a 49-year-old male, who is and at all times relevant

28   hereto, a resident of the State of California.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

3
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

14.     Defendant MEDTRONIC, INC. is a Minnesota corporation with its principal place of business at 710 MEDTRONIC Parkway, Minneapolis, Minnesota 55432.  Defendant MEDTRONIC, INC. is authorized to do business in the State of Minnesota and the State of California and has appointed an agent for services of process in this State.

15.     Defendant MEDTRONIC SOFAMOR DANEK USA, INC. is a Tennessee corporation with its principal place of business at 1800 Pyramid Place, Memphis, Tennessee 38132.  Defendant MEDTRONIC SOFAMOR DANEK USA, Inc. is authorized to do business in the State of Minnesota and the State of California and has appointed an agent for services of process in this State.  Defendants MEDTRONIC, INC., and MEDTRONIC SOFAMOR DANEK USA, INC. will hereinafter be collectively referred to as "MEDTRONIC" or "the MEDTRONIC Defendants."

16.     At all relevant times, MEDTRONIC was engaged in the manufacture, promotion, and sale of INFUSE® Bone Graft (hereinafter "INFUSE®").  INFUSE® is a surgically implanted medical device, containing a genetically engineered protein designed to stimulate bone growth.

### ALTER EGO

17.     At all times herein mentioned, each of the Defendants was the agent, servant, partner, aider and abettor, co-conspirator and/or joint venturer of each of the other Defendants herein and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their collective conduct constituted a breach of duty owed to the Plaintiff.

18.     At all times herein mentioned, Defendants were fully informed of the actions of their agents and employees, and thereafter no officer, director or managing agent of Defendants repudiated those actions, which failure to repudiate constituted adoption and approval of said actions and all Defendants and each of them, thereby ratified those actions.

19.     There exists and, at all times herein mentioned there existed, a unity of interest in ownership between certain Defendants and other certain Defendants, such that any individuality and separateness between the certain Defendants has ceased and these Defendants are the alter-ego

LAW OFFICES OF
**WALKUP, MELODIA, KELLY & SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

of the other certain Defendants and exerted control over those Defendants.  Adherence to the fiction of the separate existence of these certain Defendants as entities distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction a fraud and/or would promote injustice.

20.     At all times herein mentioned, the MEDTRONIC Defendants, and each of them, were engaged in the business of, or were successors in interest to, entities engaged in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, prescribing and/or advertising for sale, and selling products for use by the Plaintiff and Plaintiff's physicians.  As such, each of the MEDTRONIC Defendants is individually, as well as jointly and severally, liable to the Plaintiff for their damages.

21.     The harm which has been caused to Plaintiff resulted from the conduct of one or various combinations of the Defendants, and through no fault of the Plaintiff.  There may be uncertainty as to which one or which combination of Defendants caused the harm.  Defendants have superior knowledge and information on the subject of which one or which combination of the Defendants caused Plaintiff's injuries.

22.     Thus, the burden of proof should be upon each Defendant to prove that the Defendant has not caused the harms suffered by Plaintiff.

**JURISDICTION AND VENUE**

23.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and the Defendants, and because Plaintiff alleges an amount in controversy in excess of $75,000, exclusive of interest and costs.

24.     The court has personal jurisdiction over Defendants because at all relevant times they have engaged in substantial business activities in the State of California.  At all relevant times the MEDTRONIC Defendants transacted, solicited, and conducted business in Calfornia through their employees, agents, and/or sales representatives, and derived substantial revenue from such business in California.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

5

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial portion of the wrongful acts upon which this lawsuit is based occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Defendants are all corporations that have substantial, systematic, and continuous contacts in the Northern District of California and they are all subject to personal jurisdiction in this District.

## FACTUAL BACKGROUND

### A.     The INFUSE® Device and Spinal Fusion Surgery Generally

26.     MEDTRONIC designed and marketed INFUSE® for lumbar spine fusion surgery, a surgical technique in which one or more of the vertebrae of the spine are united together ("fused") so that motion no longer occurs between them.

27.     Spinal fusion is used to treat a number of conditions, including treatment of a fractured vertebra, spinal deformities (spinal curves or slippages), back pain from instability, or abnormal or excessive movement between vertebrae.  Similar to the concept of welding, spinal fusion surgery uses bone grafts to join vertebrae together and eliminate or reduce movement between vertebrae.

28.     In a spinal fusion procedure, the graft — usually the patient's own harvested bone (autograft) or cadaver bone (allograft)  — is placed in a spacer cage within the disc space between the vertebrae during the surgery.  Over the following months, a physiological mechanism similar to that which occurs when a fractured bone heals causes the graft to join, or "weld," the vertebrae together.  The goal of spinal fusion is to obtain a solid fusion of the vertebrae.

29.     For years, autologous bone graft has been considered the "gold standard" in fusion surgery.  In an autologous bone graft — or "autograft" — the surgeon procures bone graft material from another part of the patient's body, typically from the patient's pelvis or iliac crest or from the patient's own spine (from the parts of one or more vertebrae removed to gain access to the disc space to perform the fusion), and implants the bone graft in the site where fusion is desired. Successful fusions occur at very high rates in autograft procedures, as the harvested bone exhibits all the properties necessary for bone growth (including osteogenic, osteoconductive and osteoinductive properties).

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

30.     As an alternative to autograft, patients can undergo an "allograft" procedure using cadaver bone instead of autograft.   Although healing and fusion is not as predictable when using allograft as when using  autograft (the patient's own bone), an allograft eliminates the need for the harvest procedure required in an autograft.

31.     A newer option to traditional bone graft procedures is bio-engineered and bio-manufactured bone-growth materials, including INFUSE®.  INFUSE® and similar materials were thus (at least initially) appealing to many spine surgeons, since they can obviate the need for using autograft harvested from the patient's own body.

32.     INFUSE® is a genetically engineered material containing a bone morphogenetic protein ("rhBMP-2"), and is used as an alternative or supplement to autograft and allograft to help fuse the vertebrae in the spine as part of the spinal fusion surgery.  The purpose of INFUSE® is to accomplish the same clinical outcomes as grafting a patient's own bone into these locations but without the need to harvest bone from the patient's hip or spine.

33.     MEDTRONIC'S INFUSE® product consists of   (1) a metallic spinal fusion cage (the LT-Cage);  (2) the bone graft substitute which consists of liquid  rhBMP-2 (derived from Chinese hamster cells); and (3) a sponge-like carrier or scaffold for the protein (manufactured from bovine collagen) that is placed inside the fusion cage.

34.     The fusion cage component maintains the spacing and temporarily stabilizes the diseased region of the spine, while the INFUSE® bone graft component is used to form bone, which is intended to permanently stabilize (fuse) this portion of the spine.

35.     During surgery, the rhBMP-2 is soaked onto and is intended to bind with the absorbable collagen sponge that is designed to resorb, or disappear, over time.  As the sponge dissolves, the rhBMP-2 stimulates the cells to produce new bone.

36.     Certain bone morphogenetic proteins ("BMP"s) have been studied for decades because of their ability to heal bone and potentially decrease or eliminate the need for bone graft harvesting from other parts of the body.

37.     Scientists isolated the gene for one protein (rhBMP-2) from bone tissue and used molecular biology techniques to create genetically engineered cells.  These cells then produce

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

7

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

1   large quantities of rhBMP-2.  A similar process is used to manufacture other proteins, such as

2   insulin.

3        38.     Attempting to seize on this potentially lucrative opportunity to develop a  new

4   spinal fusion method, Sofamor Danek Group, Inc., a Memphis, Tennessee-based spinal device

5   maker ("Sofamor Danek"), acquired the exclusive rights to rhBMP-2 for spinal applications in

6   February 1995. The "rhBMP-2" liquid bone protein sold as INFUSE® is a genetically engineered

7   version of a naturally occurring protein that stimulates bone growth, developed as a commercially

8   viable bone morphogenetic protein ("BMP") technology.

9        39.     In October 1996, Sofamor Danek filed with the FDA an application for an

10   Investigational Device Exemption to conduct a pilot study on the effects of rhBMP-2 in humans,

11   marking the first step to obtaining approval to commercially market BMP.

12        40.     In January 1999, MEDTRONIC purchased Sofamor Danek for $3.6 billion. On

13   July 2, 2002, the FDA approved INFUSE®, a medical device containing an absorbable collagen

14   sponge that is treated with rhBMP-2, for one limited and very specific spinal fusion procedure.

15       **B.**      **FDA and FDCA Regulations Applicable to Medical Devices**

16        41.     At all times herein relevant, the United States Food and Drug Administration

17   ("FDA") was, and is, the federal agency of the United States responsible for protecting the health

18   and safety of  the public by enforcing the Federal Food, Drug and Cosmetic Act, ("FDCA"), 21

19   U.S.C. §§ 301, et  seq., and ensuring, among other things, that medical devices intended for use in

20   humans are safe and effective for each of their intended uses and that the labeling of such medical

21   devices bears true and accurate information.

22        42.     At all times herein relevant, the FDCA stated that a "device" for use in humans

23   includes "an ... implant ... or other similar or related article ... which is ... intended for use in ... the

24   treatment or prevention of disease of man ... or intended to affect the structure or any function of

25   the body of man ... which does not achieve its primary intended purposes through chemical action

26   within or on the body of man and which is not dependent upon being metabolized for the

27   achievement of its primary intended purposes." 21 U.S.C. §321(h).

28

LAW OFFICES OF
**WALKUP, MELODIA, KELLY**
**& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

43.     At all times herein relevant, the FDCA required every manufacturer of a new device to obtain approval from the FDA prior to marketing and selling its device in interstate commerce.

44.     To obtain such approval, the FDCA assigned all devices into one of three classes of devices, depending on the degree of regulatory control necessary to provide reasonable assurance of the safety and effectiveness of the device for its intended use. Class I devices pose the lowest risk to consumers' health, do not require FDA approval for marketing, and include devices such as tongue depressors; Class II devices pose intermediate risk and often include special controls including postmarket surveillance and guidance documents; and Class III devices pose the greatest risk of death or complications and include most implantable surgical devices including several types of implantable orthopedic devices for spine and hip surgery.

45.     At all times herein relevant, the FDCA provides four different ways for a manufacturer to obtain approval to introduce the device intended for human use into interstate commerce:

a.     Premarket Approval.  Before a company could market a Class III device, that company is required to submit a premarket approval ("PMA") application to the FDA that provided the FDA with a reasonable assurance that the device was safe and effective for its intended use. 21 U.S.C. §§360e(a)(2) and 360e(d)(2).  In order to show safety and effectiveness, the applicant is required to submit proof to the FDA, typically in the form of clinical trial results.

b.     510(k) Approval. Alternatively, a company could seek a premarket notification, commonly referred to as a "510(k)," from the FDA seeking a determination that the device was "substantially equivalent" to a legally marketed device. 21 U.S.C. §§360c(f) and (i) and 360(k).  If the FDA "cleared" the device by determining that the device was substantially equivalent to a device that had already demonstrated safety and efficacy, the company could market the device, which was then considered to be in the same class as the device to which it was compared. 21 U.S.C. §360c(f)(1).

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

9

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

c.      Investigational Device Exemption.  This exemption allows for clinical investigation of devices to determine safety and effectiveness for new uses. 21 U.S.C.§ 360j(g) and 21 C.F.R. §812. Submission, and subsequent approval, of an Investigational Device Exemption ("IDE") permits a device that would otherwise be required to obtain premarket approval to be shipped in interstate commerce for the purpose of conducting clinical investigations.

d.      Humanitarian Device Exemption. The fourth option to obtain approval was the submission of an application for a Humanitarian Device Exemption ("HDE").  An HDE application is not required to contain the results of scientifically valid clinical investigations demonstrating that the device was effective for its intended purpose.  The application, however, has to contain sufficient information for the FDA to determine that the device did not pose an unreasonable or significant risk of illness or injury, and that the probable benefit to health outweighed the risk of injury or illness from its use, taking into account the probable risks and benefits of currently available devices or alternative forms of treatment.  Additionally, the applicant has to demonstrate that no comparable devices were available to treat or diagnose the disease or condition, and that they could not otherwise bring the device to market.  An HDE approval is accompanied by certain additional requirements:

i.      An HDE can only be granted upon a finding by the FDA that the device was designed to treat or diagnose a disease or condition that affects fewer than 4,000 individuals in the United States.

ii.      A device approved under an HDE cannot be sold for an amount that exceeds the costs of research and development, fabrication, and distribution of the device; thus, the holder of an HDE is not allowed to make a profit on the sale of an HDE device.

iii.      An HDE device can only be used at a medical facility after an institutional review board ("IRB") at or on behalf of the medical facility approved

LAW OFFICES OF
**WALKUP, MELODIA, KELLY & SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

10

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

the use of the device for the FDA approved indication; the IRBs acts as a safeguard that the HDE devices were being used properly.

46.     The FDCA required that a submission for approval of a device include proposed labeling for the proposed intended uses of the device that includes, and among other things, the conditions for therapeutic use.  A device manufacturer is not permitted to promote and market a new device until it has an approval, including approval for the proposed labeling.  Moreover, if approved, the device manufacturer is permitted to promote the device only for the medical conditions of use specified in the approved labeling.  Uses not approved by the FDA are known as "unapproved" or "off-label" uses.

47.     Devices that are promoted for uses that have not been approved by the FDA are deemed to be misbranded under the FDCA (21 U.S.C. §§ 331(a) and 333(a)(2)).

48.     The regulatory framework mandates that MEDTRONIC is prohibited from promoting a use of Infuse other than the "specified use."  21 U.S.C. § 331(a); *see also* 21 C.F.R. § 814.80 (providing that a "device may not be . . . advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device.")

49.     The FDCA, as amended by the MDA, expressly prohibits manufacturers from the "introduction or delivery for introduction into interstate commerce of any . . . device . . . that is . . . . misbranded."  21 U.S.C. § 331(a).  A device is misbranded under the FDCA as amended if, *inter alia*, "its labeling is false or misleading in any particular," 21 U.S.C. § 352(a), or its labeling does not bear "adequate directions for use," 21 U.S.C. § 352(f)(1).

50.     Adequate directions are "directions under which the layman can use [the] device safely and for the purposes for which it is intended."  21 C.F.R. § 801.5.  "Directions for use may be inadequate because, among other reasons, of omission, in whole or in part, or incorrect specification of . . . [s]tatements of all conditions, purposes or uses for which such device is intended."  21 C.F.R. § 801.5(a).  For purposes of the FDCA, the intended use of a medical device is determined on the basis of "the objective intent of the persons legally responsible for the labeling of [such] device[]."  21 C.F.R. § 801.4.  Such intent is determined by the "circumstances surrounding the distribution of the article.  Id.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

11
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

51.     Promotion of Infuse for a new use, whether explicitly or implicitly, would represent a major change or modification in the intended use of the device, which would require a new premarket notification.  21 CFR 807.81(a)(3)(ii).

52.     When a manufacturer directly or indirectly promotes a device for a new ("off-label") use, the device is adulterated under section 501(f)(1)(B) of the Act, 21 U.S.C. 351(f)(1)(B), because it lacks an approved application for premarket approval (PMA) in effect pursuant to section 515(a) of the Act, 21 U.S.C. 350e(a), or an approved application for an investigational device exemption (IDE) under section 520(g) of the Act, 21 U.S.C. 360j(g).  Under those circumstances, the device is also misbranded under section 502(o) of the Act, 21 U.S.C. 352(o) because there is no submission to the FDA of a notification respecting the changes to the intended use of the device, as required by section 510(k) of the Act, 21 U.S.C. 360(k) and 21 CFR § 807.81 (a)(3).

53.     The FDA has made it clear that a medical device that is promoted for off-label uses is deemed misbranded in violation of 21 U.S.C. § 352(f) (misbranding) and distribution is prohibited pursuant to 21 U.S.C. §331(a) and (k).  *See* 65 Fed. Reg. 14286 (Mar. 16, 2000) ("a medical device that is distributed for a 'new use' is 'adulterated' . . . and 'misbranded' . . . .").

54.     Not only does the FDA prohibit off-label promotion, it also specifically prohibits false advertising.  The FDA regulations at 21 U.S.C. §§ 352, 352(q)(1) provide that "[a] drug or device shall be deemed to be misbranded . . .  if . . . its advertising is false or misleading in any particular."

**C.      The MEDTRONIC INFUSE® Bone Graft Product**

55.     INFUSE® is recombinant human bone morphogenetic protein-2 ("rhBMP-2") known as dibotermin alfa.  It is a produced by a genetically engineered Chinese hamster ovary line. It induces new bone tissue at the site of implantation.

56.     INFUSE® is sold with ACS, a soft, white, pliable absorbent implantable matrix that is intended to act as a carrier and scaffold for new bone formation.

57.     At all relevant times, INFUSE® was researched, developed, manufactured, marketed, promoted, advertised and sold by the MEDTRONIC Defendants.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

12

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

**D.     INFUSE® Bone Graft Limited Approval**

58.     In October 1996, Sofamor Danek submitted an IDE to the FDA to study the use of rhBMP-2 as applied to an absorbable collagen sponge inserted into an LT-Cage interbody fusion device to treat patients with degenerative disc disease. Designed as a pilot study intended to support the initiation of a larger pivotal study, the IDE involved 14 patients—11 of which received spinal fusion procedures using the rhBMP-2/ACS/LT-Cage device and 3 who received the LT-Cage with autologous bone—and marked the first time rhBMP-2 was used in patients undergoing spinal fusion. In this initial clinical trial, all 11 patients who had been implanted with rhBMP-2 achieved successful fusion within six months from the time of surgery.

59.     Sofamor Danek used the results of the pilot study to petition the FDA to initiate a pivotal trial of rhBMP-2 with the LT-Cage®. This trial, which was approved by the FDA in July 1998, involved 135 investigational patients who had rhBMP-2 implanted in a single-level Anterior Lumbar Interbody Fusion (ALIF) procedure and 135 control patients who underwent the same procedure using autologous bone graft instead of rhBMP-2.

60.     After acquiring Sofamor Danek in 1999, MEDTRONIC filed the INFUSE® PMA on January 12, 2001, and was granted expedited review status by the FDA.

61.     As presented in MEDTRONIC's original PMA (eventually approved by the FDA in July 2002), the initially-approved INFUSE® product consisted of two components:

a.     A specific type of spacer (the LT-Cage Lumbar Tapered Fusion Device) component, which is a thimble-sized hollow metal cylinder which keeps the two vertebrae in place and provides a frame that contains and directs the development of new bone growth; and

b.     The INFUSE® Bone Graft Component, which includes a collagen sponge that acts as a carrier and scaffold for the active ingredient in INFUSE®, and rhBMP-2, the actual active ingredient that is reconstituted in sterile water and applied to the collagen sponge before it is placed inside the spacer cage.

62.     On July 2, 2002, the FDA approved INFUSE® for certain limited uses.

63.     The FDA approved INFUSE® Bone Graft for a small percentage of overall spinal fusion surgeries, with the device label specifying the limited surgical application to be used.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

64.     As presented in MEDTRONIC'S original PMA and eventually approved by the FDA in July 2002, the initially-approved INFUSE® Bone Graft product consisted of two components (1) the LT-CAGE® Lumbar Tapered Fusion Device Component, a thimble-sized hollow metal cylinder; and (2) the INFUSE® Bone Graft Component, which includes (a) an absorbable collagen sponge ("ACS") that acts as a carrier and scaffold for the active ingredient in INFUSE® Bone Graft, and (b) rhBMP-2, the active ingredient that is reconstituted in sterile water and applied to the ACS.  Although these two components are sold separately, the initial approved labeling for the product indicates that the INFUSE® Bone Graft must be used with the LT-CAGE component.

65.     INFUSE® Bone Graft was approved only for use in a single-level fusion in the L4-S1 region of the lumbar spine, in a skeletally mature patient with degenerative disc disease at one level from L4-S1 (including patients with Grade I spondylolisthesis at the involved level), via the Anterior Lumbar Interbody Fusion ("ALIF") procedure and in combination with a LT-CAGE Lumbar Tapered Fusion Device.

66.     INFUSE® has never been approved by the FDA for use in other parts of the body or for use in any other type of procedure, other than two non-spinal uses as noted in footnote 1. Any such uses are thus, by definition, "off-label" experimental uses not approved by the FDA.[1]

67.     INFUSE® was approved to be sold in kit sizes small (2.8 ml rhBMP-2), medium (5.6 ml rhBMP-2) and large (8.0 ml rhBMP-2). MEDTRONIC sought approval from the FDA for a product called AMPLIFY, which utilized a higher dose of rhBMP-2, but the FDA denied approval of the product.

---

[1] While the product's label remains substantially the same as that approved by the FDA in 2002, the FDA has made minor amendments to the label through post-approval supplements. For example, on July 29, 2004, the FDA approved a supplement expanding the indicated spinal region from L4-S1 to L2-S1. INFUSE® has been approved by the FDA for only two other uses:  certain oral maxillofacial surgeries and repair of tibial fractures that have already been stabilized with IM nail fixation after appropriate wound management.  INFUSE® was approved by the FDA on March 9, 2007, for certain oral maxillofacial uses. While INFUSE® has also been approved for treatment of certain tibial fractures and certain oral maxillofacial uses, these uses represent a very minor percentage of the product's overall sales.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY & SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

14
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

**E.     Off-Label Use of INFUSE® is Dangerous**

68.     There are numerous lumbar and cervical spine surgical procedures for which INFUSE® was not initially approved, and for which it has never subsequently been approved.  No cervical fusion procedure, whatsoever, using INFUSE® has ever been approved by FDA, regardless of the approach or procedure.  The non-approved lumbar procedures include:

a.      Posterior Lumbar Interbody Fusion ("PLIF"), a procedure that is used to treat nerve compression, and back pain resulting from a number of causes, involves approaching the spine from the back.  PLIF, however, is a more delicate surgical approach in some respects and procedure because the spinal canal and nerves are posterior to the vertebral body, and because a surgeon must manipulate the dural sac (the membranous sac that encases the spinal cord within the vertebral column) to perform the PLIF procedure;

b.      Posterolateral Fusion ("PLF") which is similar to the PLIF procedure, but instead of removing the disc space and replacing it with a bone graft, the disc space remains intact and the bone graft is placed between the transverse processes in the back of the spine.  This allows the bone to heal and stabilizes the spine by fusing the transverse process of one vertebra to the transverse process of the next vertebra; and

c.      Transforaminal Lumbar Interbody Fusion ("TLIF"), which is also similar to the PLIF procedure, and is a technique utilized when an inter-body fusion is performed via a posterior approach.  TLIF allows the surgeon to perform a fusion from a posterior approach without disturbing the dural sac by approaching the spine via a more lateral, or sideways, approach.  Physicians may use FDA-approved medical devices in any way they see fit — either on-label or off-label, but medical device companies are prohibited by federal law to promote off-label uses for their medical devices or to pay doctors inducements or kickbacks to promote off-label uses, or to perform procedures using the devices off-label.  When a physician wishes to use a medical device in an off-label manner, he or she must inform the patient of the off-label nature of the surgery and the expected risks and benefits of such off-label use, and obtain the patient's informed consent to such use.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

15

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

69.     The FDA's approval of INFUSE® was limited to one specific lumbar procedure (the ALIF procedure) due to FDA's concerns about potential adverse events in posterior uses that had already been reported at the time of the product's approval. As a result, the FDA approved INFUSE® for the small percentage of overall spinal fusion surgeries which are ALIF procedures, with the device label specifying this limited surgical application.

70.     FDA approval of INFUSE® was limited to ALIF only because of adverse events resulting from the use of rhBMP-2 in off-label applications. In particular, a MEDTRONIC-sponsored trial examining the application of rhBMP-2 in off-label PLIF (Posterior Lumbar Interbody Fixation) procedures was halted in December 1999 when uncontrolled bone growth developed in a number of the patients. Indeed, the study reported that one patient required two additional surgeries to remove excessive bone growth from the spinal canal. Such bone overgrowth observed in this PLIF trial was particularly alarming because it could, and did in many patients, result in worsening the very pain that the fusion procedure was designed to eliminate, and in some cases necessitating difficult revision surgeries to remove the bone overgrowth.

71.     Moreover, the 1999 PLIF trial demonstrated that bone overgrowth complications from INFUSE® result from the product's very mechanism of action; i.e., rhBMP-2 stimulates the growth of new bone. Thus adverse events can result when the rhBMP-2 leaks out of the area in which bone growth is desired and/or when too much rhBMP-2 is used. In such cases, INFUSE® can stimulate bone growth where new bone is not desired or can lead to excessive bone growth in the target area, which is often associated with other complications such as swelling, compression of nerves, and associated pain. Such unintended bone growth and swelling can be especially problematic in spinal surgeries because of the proximity to sensitive neurological structures in which INFUSE® is used; i.e., the spinal cord and the exiting nerve roots.

72.     During the FDA Advisory Committee Panel ("FDA Panel") hearing on January 10, 2002 concerning potential FDA approval of INFUSE®, panel members voiced concerns regarding potential off-label use of the product, and asked MEDTRONIC to describe its efforts to guard against off-label use of the product.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

73.     In response to FDA concerns of off-label applications, one MEDTRONIC consultant, who is alleged to have received hundreds of thousands of dollars in the form of kickbacks from consulting agreements promoting INFUSE®, dismissed the FDA Panel's concerns of off-label use, stating: "this specific application before the panel today is through an anterior approach," and thus, "seems to me to be outside the scope of what we ought to be focusing on today."

74.     Reiterating its concerns on off-label use, the FDA Panel cautioned MEDTRONIC to guard against procedures outside the specifically approved ALIF procedure provided in the labeled application. The FDA Panel's admonishment included concerns voiced by panel member Dr. John Kirkpatrick that off- label use could result in harm to patients. More specifically, the use of the *tapered* LT-Cage — which is difficult to implant in a posterior approach—would, if required, "prevent a majority of surgeons from applying this from a Posterior Lumbar Interbody Fusion [PLIF] perspective." In other words, the FDA explicitly warned MEDTRONIC against promoting INFUSE® for use in off- label PLIF procedures because, according to the statements of the FDA Panel, such use could endanger patients.

75.     At this 2002 FDA Advisory Committee Panel hearing, the panel members stressed concerns regarding potential off-label use of the product and repeatedly asked the MEDTRONIC presenters questions about how MEDTRONIC would seek to guard against off-label applications of the product.

76.     At the conclusion of the hearing, the FDA Advisory Panel again reiterated concerns regarding the potential for off-label use, specifically admonishing the MEDTRONIC Defendants to guard against procedures other than the specific ALIF (anterior lumbar interbody fusion) procedure approved by the FDA.

77.     The off-label use of INFUSE® in the spine frequently causes serious adverse events.  This has been known to MEDTRONIC and its key "opinion leaders" for many years.

78.     The FDA Panel's  initial fears in 2002 on the dangers of off-label use of this product were confirmed by subsequent medical studies which demonstrate that off-label use of INFUSE® could present severe risks to patient safety.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY & SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

17

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

79.     For example, an early study sponsored and funded by MEDTRONIC in 1999, years prior to FDA's approval of INFUSE® for ALIF procedures demonstrated an approximately 70% rate of ectopic bone growth — meaning bone overgrowth where such growth is not desired.  Only a few months into this clinical trial of INFUSE®, CT scans showed unwanted bone had formed in the spinal canals of 70% of the patients. The clinical trial, intended to include hundreds of people with degenerative disc disease, was thus halted after only 34 patients received INFUSE®.

80.     A spine surgeon who participated in this PLIF with INFUSE® study reported that one of the patients he treated required two extra surgeries to clear the excessive bone growth from the patient's spinal canal.  The complications observed in this PLIF trial were particularly serious given the potential of neural impingement (or nerve pinching) from such bony overgrowth in that procedure, potentially triggering the very sort of pain that a fusion procedure attempts to eliminate.

81.     This bone overgrowth results from INFUSE®'s very mechanism of action.  In such cases, INFUSE® can stimulate bone growth where new bone is not desired and can lead to excessive bone growth into areas where bone should not be growing — *i.e.*, into or against the spinal cord or other spinal nerves.

82.     There is insufficient scientific evidence concerning the proper dosages of rhBMP-2 for use in the off-label procedures such as PLIF, TLIF, PLF and cervical fusions,  or the expected responses to the protein in different biological environments.  Indeed, many adverse events associated with the use of INFUSE® result from off-label use of the product by surgeons who do not fully understand the highly potent nature of this molecule.

83.     A study entitled, "Prevalence, Complications, and Hospital Charges Associated with Use of Bone-Morphogenetic Proteins in Spinal Fusion Procedures,"  Cahill, et al, *JAMA*, 2009 Jul 1;302(1):58-66, analyzed the integration of BMP into spinal surgeries since 2002, and the association between its use and postoperative complications, length of hospital stays, and hospital charges. Significantly, the study determined that use of bone morphogenetic proteins is associated with a substantially higher rate of complications in anterior cervical fusion procedures, which has resulted in an approximate 41% increase in hospital charges for these procedures. Notably, the study only considered complications that occurred during postoperative inpatient

LAW OFFICES OF
**WALKUP, MELODIA, KELLY**
**& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

18

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

1   hospitalization immediately following the surgical procedure, and did "not include delayed

2   complications in the outpatient setting," such as hospital readmission-related complications.

3       84.     Such a shortcoming likely resulted in a significant understatement of the extent of

4   complications resulting from use of bone morphogenetic proteins because, as an FDA Public

5   Health Notification regarding complications from use of BMP in the cervical spine indicated,

6   "[m]ost complications occurred between 2 and 14 days post-operatively with only a few events

7   occurring prior to day 2." Indeed, acknowledging this fact, Dr. Kevin S. Cahill, who led the study,

8   publicly commented, "ours is probably a bottom estimate."

9       85.     Aside from potential understatement of complications, the study found that the rate

10  of complications in anterior cervical fusions was 51.4% higher when using bone morphogenetic

11  protein than in similar cases when bone morphogenetic protein was not used. These complications

12  included increased rates of voice and swallowing-related problems, and swelling of the neck. The

13  study's authors noted a "significantly greater" rate of complications when using bone

14  morphogenetic proteins in these surgeries, even after considering and compensating for numerous

15  other variables that could affect complications rates, such as age, sex, etc.

16      86.     Astonishingly, it was not until 2004 that a paper about the disastrous 1999 PLIF

17  trial by spine surgeons with financial ties to MEDTRONIC was finally published in a medical

18  journal.  This article inaccurately maintained that these patients were not harmed by INFUSE®.

19  The paper (Haid, et al, *Posterior lumbar interbody fusion using recombinant human bone*

20  *morphogenetic protein type 2 with cylindrical interbody cages. The Spine Journal*, 4(5):527-538,

21  September 2004) downplayed the bone overgrowth complications claiming that while it showed

22  up on CT scans, patients did not suffer ill effects.  This claim was false and misleading and further

23  encouraged dangerous off-label uses of INFUSE®.

24      87.     In fact, David Malone, M.D., a Tulsa, Oklahoma spine surgeon involved in this

25  1999 PLIF clinical trial with INFUSE®, told the *Milwaukee Journal Sentinel* that two of his

26  patients had to undergo additional surgeries because the BMP-induced bone overgrowth was

27  painfully impinging on their nerve roots.  One of the patients, a man who was in his 50s at the

28  time, needed three operations - one for the implant, a second to remove the unwanted bone

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

19

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

1  formation, and then a third when the additional bone grew back yet again.[2]

2      88.    "It was a pretty amazing biological response," Malone said in an interview.  "It

3  grew back even larger than the first time.  It got to the point that secretaries in our clinic could

4  look at X-rays and tell who got the BMP (INFUSE®) and who did not.  You could see that much

5  bone growth."[3]

6      89.    A May 15, 2006 medical article in *Spine* entitled "Controlling Bone Morphogenetic

7  Protein Diffusion and Bone Morphogenetic Protein-Stimulated Bone Growth Using Fibrin Glue"

8  observed, "rhBMP-2 may stimulate bone growth in areas in which bone is not desired, especially

9  as the material 'leaks' into such spaces. . . . Although this phenomenon has not been thoroughly

10  studied, it implies that the release of rhBMP-2 into the soft tissues stimulates a rapid, potentially

11  life-threatening, inflammatory reaction." [4]

12      90.    Again, in a November 2006 issue of *Spine* , several authors noted a significantly

13  increased risk of swelling from off-label use of INFUSE® in cervical spine fusions compared to

14  traditional fusion surgeries. Of the 234 patients studied, 27.5% of those patients treated with

15  INFUSE® had significant swelling after the surgery, while only 3.6% of those patients not treated

16  with INFUSE® experienced such a complication. Further analysis demonstrated that "patients

17  receiving rhBMP-2 were ***10.1 times more likely*** to have a swelling complication versus those who

18  did not receive rhBMP-2." (emphasis added)[5]

19      91.    A March 2007 article in *The Spine Journal* highlighted the severity of the

20  complications associated with off-label use of INFUSE®. According to this article, five days after

21  INFUSE® was implanted off-label in a cervical spine fusion surgery, the implanted patient

22  experienced serious swelling of the neck and difficulty swallowing which required emergency

23

24  _____
[2] *See, e.g.*, "INFUSE® Cited in Patients' Painful Bone Overgrowth:  More Surgery Needed After
25  Use, Surgeon Says," by John Fauber, *Milwaukee Journal Sentinel*, June 27, 2011.

[3] *Id*.
26
[4] Patel, et al, *Controlling Bone Morphogenetic Protein Diffusion and Bone Morphogenetic
27  Protein-Stimulated Bone Growth Using Fibrin Glue, Spine,* 31(11): 1201-1206, May 2006.

[5] Smucker, et al, *Increased Swelling Complications Associated with Off-Label Usage of rhBMP-2
28  in the Anterior Cervical Spine, Spine,* 31(24): 2813-2819, November 2006.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

20
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

1    medical treatment such as an exploratory surgery and implantation of a breathing tube.[6]

2         92.    A *European Spine Journal* article in August 2007 found that use of INFUSE® in

3    certain cervical spine fusions resulted in a statistically significant increase in the number of

4    complications, including dysphagia (difficulty in swallowing) and swelling in the neck area. The

5    authors determined that "[d]ysphagia was a common complication and it was significantly more

6    frequent and more severe in patients in whom rhBMP-2 was used. Post-operative swelling . . . was

7    significantly larger in the rhBMP-2 group." Of the patients evaluated, 85% of those treated with

8    INFUSE® reported difficulty swallowing after the surgery; a complication that was far less severe

9    in those not treated with INFUSE®. Indeed, one patient required a feeding tube for six weeks after

10   the surgery as a result of the complication. [7]

11        93.    On July 1, 2008, the FDA issued a Public Health Notification to healthcare

12   practitioners entitled "Life-threatening Complications Associated with Recombinant Human Bone

13   Morphogenetic Protein in Cervical Spine Fusion" (the "FDA Notification"), which strongly

14   warned medical professionals who used INFUSE® and other BMP products of serious

15   complications that had occurred from the off-label use of these products in the cervical spine.[8]

16        94.    The FDA Notification stated that the agency had received numerous reports of

17   complications from BMP use in the cervical spine that "were associated with swelling of neck and

18   throat tissue, which resulted in compression of the airway and/or neurological structures in the

19   neck. Some reports describe difficulty swallowing, breathing or speaking." The notification further

20   stated that these complications had resulted in "the need for emergency medical intervention,"

21   which included "respiratory support with intubation, anti-inflammatory medication, tracheotomy

22   and most commonly second surgeries to drain the surgical site." The FDA Notification concluded

23

24   _____

     [6] Perri, et al, *Adverse Swelling Associated with Use of rh-BMP-2 in Anterior Cervical Discectomy
     and Fusion: A Case Study, The Spine Journal,* 7(2): 235-239, March 2007.

25   [7] Vaidya, et al, *Complications of Anterior Cervical Discectomy and Fusion Using Recombinant

26   Human Bone Morphogenetic Protein-2, European Spine Journal,* 16(8): 1257-1265, March 2007.

27   [8] FDA Public Health Notification: Life-threatening Complications Associated with Recombinant
     Human Bone Morphogenetic Protein in Cervical Spine Fusion, July 1, 2008,
     http://www.fda.gov/MedicalDevices/Safety/AlertsandNotices/PublicHealthNotifications/ucm062000.htm

28

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

1    that "in light of the serious adverse events described above, FDA recommends that practitioners

2    either use approved alternative treatments or consider enrolling as investigators in approved

3    clinical studies."

4        95.    On September 4, 2008, *The Wall Street Journal* published a front-page article

5    entitled "MEDTRONIC Product Linked to Surgery Problems."[9]  This article noted both the

6    complications resulting from the use of INFUSE® in the cervical spine already disclosed in the

7    FDA Notification and additional complications resulting from other off-label applications of the

8    product, stating:

9            The FDA's alert about INFUSE® was specific to neck surgeries.
             But a review of FDA records and medical literature shows there
10           have been scores of other cases in which serious complications arose
             after the product was used in other off-label situations. Many of
11           these cases involve unwanted bone growth near nerves or in areas
             outside targeted fusion sites. That can lead to pain, repeat surgeries
12           and, in some cases, emergency intervention.

13   The article further stated that at least three-quarters, or 75%, of the adverse events reported to the

14   FDA involved off-label use of INFUSE®. Of course, this news had serious implications for

15   MEDTRONIC because off-label use of INFUSE® accounted for the majority of all INFUSE®

16   sales.

17       96.    A September 2008 article in *The Spine Journal* also observed that the use of

18   INFUSE® in the cervical spine "has been associated with reports of serious adverse events.[10]

19   Postoperative hematoma formation [a collection of blood outside the blood vessels, generally

20   manifesting as bruises], prevertebral soft tissue swelling, [and] swallowing difficulty . . . are a few

21   examples." Of the complications observed in this patient study group, 17% occurred in patients

22   treated with traditional techniques, while 83% occurred in patients treated off-label with

23   INFUSE®. The authors concluded that the "cervical spine has proven much less forgiving with

24   the institution of rhBMP-2 use. Complications induced by . . . rhBMP-2 were clearly evident in

25

26   [9]  "Medtronic Product Linked to Surgery Problems," by David Armstrong and Thomas M. Burton,
     *Wall Street Journal*, September 4, 2008.

27   [10]  Jarosz, et al, *Complications of BMP Use in Cervical Spine Surgery, The Spine Journal,* 8(5):
     23S-24S, September 2008.

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

22

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

our review."

97.     On November 18, 2008, in connection with reporting MEDTRONIC's financial results for its 2009 second quarter (ended October 24, 2008), MEDTRONIC reported that revenue from its Spinal segment had, in fact, declined to $829 million for the quarter – down $30 million from the previous quarter. The decreased sales in the Spinal segment, clearly stemming from a significant decline in INFUSE® sales, were a sharp deviation from MEDTRONIC's reports of repeated, double-digit, growth in the Spinal segment in previous quarters. Moreover, MEDTRONIC disclosed, for the first time, that it "recently received a subpoena from the Department of Justice looking into off-label use of INFUSE®."

98.     Thereafter, MEDTRONIC continued to report lower sales of INFUSE®, which it admittedly linked to a public health notice from the FDA regarding off-label use of recombinant human bone morphogenetic protein in the cervical spine that was issued in July 2008, a previously disclosed government investigation, negative newspaper stories, and a whistleblower lawsuit filed by two former MEDTRONIC employees against MEDTRONIC and a number of spine surgeons and distributors of the INFUSE® bone graft.

99.     The use of INFUSE® in off-label procedures was further scrutinized in a study published in the July 1, 2009 issue of JAMA that documented the health risks associated with off-label use of INFUSE® and, contrary to previous studies conducted by MEDTRONIC-funded physicians, cast doubt on the cost-effectiveness of the product.[11]

100.     At least 1,200 reports of adverse events involving INFUSE® have been made to the FDA from 2002 to 2011.   In 2011, for example, 278 INFUSE®-related adverse events were reported; in 2010, 362 adverse events were reported;, and in 2009, 244 adverse events were reported.  The vast majority of these adverse event reports involve off-label use of INFUSE®.

101.     In fact, in a 2012 article published in The Spine Journal, FDA researcher Emily Woo, M.P.H. concluded on-label use of INFUSE® accounts for only a tiny percentage (0.5%) of

_____

[11] Cahill, et al, *Prevalence, Complications, and Hospital Charges Associated with Use of Bone-Morphogenetic Proteins in Spinal Fusion Procedures, JAMA*, 302(1): 58-66, July 2009.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

adverse events.  Off-label use of INFUSE® accounts for 99.5% of adverse events.[12]

**F.  MEDTRONIC Knew and Concealed the Dangers of Off-Label Use**

102.  Even at the time of FDA approval, MEDTRONIC and its senior management and its paid consultant "opinion leaders," were well aware of the concerns regarding off-label uses of INFUSE® and the serious dangers to patients posed by those off-label uses.

103.  Notwithstanding the original FDA Panel's well-founded concerns regarding off-label use, as well as the medical literature corroborating the same, both of which MEDTRONIC had knowledge, MEDTRONIC intentionally, negligently and recklessly concealed these dangers from the general public, including the Plaintiff and Plaintiff's physicians. Defendants had actual knowledge of the Advisory Committee's concerns regarding off-label use of the product, and the dangers posed by off-label use. Indeed, Defendants were on actual notice at this time of the Advisory Committee's warnings that MEDTRONIC should guard against off-label uses of this potent genetically-engineered liquid bone protein. Thus, even prior to FDA approval, Defendants were on actual notice of the dangers that off-label use of INFUSE® posed to patients, such as the Plaintiff.

104.  Further, as described immediately infra, the MEDTRONIC-funded studies on INFUSE® from 1999 to until at least 2007 failed to accurately describe the adverse effects that were observed in the earliest trials of INFUSE®, such as severe uncontrolled or ectopic bone growth, severe inflammatory reactions, adverse back and leg pain events, radiculitis, retrograde ejaculation in men, urinary retention, bone resorption, and implant displacement.  These MEDTRONIC-funded articles also omitted any mention of the risks of sterility and cancer associated with rhBMP-2 use, as reported in FDA documents and hearings.  MEDTRONIC discouraged the publication of these results in the medical journal literature, thereby hiding significant side effects from spine surgeons and patients.

---

[12] Emily Jane Woo, *Recombinant Human Bone Morphogenetic Protein 2: Adverse Events Reported to the Manufacturer and User Facility Device Experience Database, The Spine Journal,* 12(10): 894-899, October 2012.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

105.    Further, Confidential Witness #2 ("CW 2") in a shareholder derivative lawsuit filed on against MEDTRONIC, more fully discussed supra, stated that MEDTRONIC was aware of adverse events resulting from off-label use of INFUSE® in the cervical spine, including swallowing, and breathing problems.

106.    In response to these reports of adverse events, CW 2 stated that MEDTRONIC attempted to disseminate information to the medical community regarding what it considered to be the proper dose of INFUSE® for this off-label application. MEDTRONIC also issued a "Safety Alert" letter to surgeons on September 14, 2004, informing them that MEDTRONIC had received reports of complications associated with off-label use of INFUSE® in anterior cervical fusion procedures. MEDTRONIC wrote, "[l]ocalized soft tissue edema has been reported in anterior cervical spine fusion surgery following the use of INFUSE® Bone Graft…. Some reports were accompanied by patient complaints of swelling and difficulty in swallowing and breathing, three of which resulted in surgical intervention." (Emphasis added.)

107.    These adverse events were not isolated incidents, as described above.  These adverse event reports from off-label uses of INFUSE® indicate the very same complications as those noted in the studies discussed above, including, swelling, difficulty swallowing and breathing, excessive bone growth resulting in dangerous and painful spinal nerve compression and corresponding injuries, etc., and often require emergency medical intervention or a second surgery.

108.    For example, a December 12, 2005 report indicates that four or five days after an off-label PLIF procedure using INFUSE®, the patient's swelling became so severe that surgical intervention was required. These are only a few examples of the hundreds of similar reports of serious complications related to off-label uses of INFUSE® found on the MAUDE Database.

109.    A November 3, 2006 report indicates that a patient reported neck swelling, difficulty swallowing and possible shortness of breath two to three days after a cervical spine fusion using INFUSE®. As a result, this patient had to undergo another surgery four days after the initial fusion.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

110.   And a July 21, 2008 report indicates that a patient developed massive neck swelling, very thick tracheal and bronchial secretions, and required a tracheostomy—a procedure in which an incision is made in the neck and a tube inserted to allow the patient to breathe— following a cervical fusion procedure with INFUSE®.

111.   Through MEDTRONIC's monitoring procedures—which include written procedures for complaints, corrective and preventative actions and adverse event reporting—all complaints and adverse events are documented, tracked, and trended (or should be) in a database. MEDTRONIC is required by federal regulation to "establish and maintain" such an adverse event database.  See 21 C.F.R. § 803.1(a).  In addition, a report from a June 2006 FDA inspection of a MEDTRONIC facility at 1800 Pyramid Place in Memphis, Tennessee, revealed that MEDTRONIC had initiated a Preventative Action, dated April 21, 2006, and was "studding [sic] the reason for an increase in the number of reported fluid collection, hematoma, and seroma complaints since 4/2005." According to the report, the "study indicated that sales for the INFUSE® Bone Graph [sic] have increased and more graphs [sic] are being implanted," and that the "study is still open."

112.   According to Confidential Witness #15 ("CW 15") in the Minneapolis Firefighters lawsuit filed on against MEDTRONIC, more fully discussed supra, a Senior Vice President who worked at MEDTRONIC for numerous years until 2006 and a "Quality Group" at MEDTRONIC's Spine division were responsible for addressing adverse events. According to CW 15, former COO Michael DeMane, former President of MEDTRONIC Spinal and Biologics Mr. Wehrly, and former Worldwide Vice President and General Manager, Biologics, Jon Serbousek, were all aware of the adverse events related to INFUSE®.  As a part of his employment with Defendants, CW 15 discussed the complaints related to INFUSE® at meetings with these individuals and members of the Quality Group to decide whether or not certain adverse events should be reported to the FDA.  Moreover, MEDTRONIC's Spinal division used the very same complaint/adverse event reporting system as MEDTRONIC corporate, which provided MEDTRONIC's executive officers access to a database containing details of every complaint/adverse event MEDTRONIC received relating to INFUSE®.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY**
**& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

26

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

113.    MEDTRONIC was further clearly aware of its settlement with the Department of Justice ("DOJ") and entry into a Corporate Integrity Agreement, discussed supra, in July of 2006. As a result, MEDTRONIC had actual knowledge of the heightened risks to spine patients associated with MEDTRONIC's illegal, improper, and unethical promotion of off-label use of INFUSE® by MEDTRONIC's Spinal or Biologics Divisions.

**G.    INFUSE® is Profitable and thus MEDTRONIC had an Economic Motive to Promote INFUSE® Off-label.**

114.    INFUSE® has become a best seller for MEDTRONIC.  MEDTRONIC's INFUSE® sales have exceeded $3.6 billion since the launch of the INFUSE® Bone Graft in July 2002. As a J.P. Morgan research analyst covering MEDTRONIC noted in a report dated November 12, 2008: "INFUSE® is an $800M product for MEDTRONIC (6% of sales), having enjoyed robust growth since its initial approval in the U.S. in July 2002. In fact, it is the one piece of MEDTRONIC's Spine business that continues to post strong double-digit growth without any issues (LTM: +16.9%). That is, until now. "

115.    MEDTRONIC has depended heavily on INFUSE® sales because so many of its other products, such as cardiac defibrillators, have slowed as the result of recalls of those defective defibrillators in the past several years.

116.    Sales of INFUSE® were approximately $800 million for the 2011 fiscal year, and the vast majority of these sales were attributable to off-label use of the product.  Off-label uses of INFUSE® account for 85% to 90% of all spine surgeries involving INFUSE®.

117.    Plaintiff is informed and believes and based thereon alleges that, as a result of MEDTRONIC's illegal and improper off-label promotion, sales of INFUSE® have soared and have totaled more than 4 billion of dollars from 2002 to 2011.

118.    MEDTRONIC has consistently sought to expand the use of INFUSE® by, among other things, illegally and improperly promoting dangerous and/or insufficiently studied off-label uses for INFUSE® in various parts of the spine for various types of spine surgeries, as discussed throughout this Complaint.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY & SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

27
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

### H.    MEDTRONIC Improperly Promoted Off-Label Uses of INFUSE®.

119.    In spite of the very specific and limited FDA approval of INFUSE® (for ALIF procedures only), the overwhelming majority of MEDTRONIC's INFUSE® sales have been driven by non-FDA approved, or "off-label," uses, such as that used on the Plaintiff in this civil action.  Until recently, MEDTRONIC was very successful (and profitable) in driving off-label sales of INFUSE® through undisclosed "consulting" and royalty agreements with physicians who, in exchange for handsome sums of money from MEDTRONIC or lavish trips paid for by MEDTRONIC, would push off-label usage in a number of ways, including by authoring scientific and medical literature promoting such uses, and by direct advocacy to other spine surgeons.

120.    MEDTRONIC also directed its own sales representatives to promote off-label uses of the product, many of whom went so far as to recommend dosages of this potent molecule in risky off-label procedures, and guide surgeons through off-label uses of the product during surgery. Indeed, MEDTRONIC's unlawful off-label promotion campaign was so extensive that it caught the attention of, among others, the FDA (on numerous occasions), the United States DOJ, Congress, the United States Army, several major universities, multiple medical journals, numerous major newspapers, independent physicians, and investors.

121.    Moreover, MEDTRONIC's unlawful off-label campaign has resulted in, among other actions. two whistleblower lawsuits (resulting in a multi-million dollar settlement with the DOJ, which included a Corporate Integrity Agreement), a shareholder derivative lawsuit that was recently settled for $85 million, several adverse regulatory actions by the FDA, and a congressional investigation (led by the United States Senate Committee on Finance).

122.    Indeed, even following MEDTRONIC's settlement with the DOJ in 2006 for unlawful kickbacks to physicians to use and promote its products, and corresponding entry into a Corporate Integrity Agreement ("CIA"), discussed supra, MEDTRONIC failed to disclose its continued reliance on kick-backs, royalties, and other undisclosed payments to physicians to drive INFUSE® sales, primarily for off-label use.

123.    Off-label use of INFUSE® was and remains particularly concerning due to the known adverse (and in at least one case deadly) side effects known to MEDTRONIC at the time of

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

28

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

the product's original FDA approval in 2002.   Nonetheless, off-label use of INFUSE® increased year-after-year from the time of its original limited use approval by the FDA in 2002, to the point where off-label use of INFUSE® Bone Graft accounted for an astounding 85% to 90% of all INFUSE® sales.

124.    Although undisclosed by MEDTRONIC, the first-hand accounts of its former employees demonstrate that this extraordinarily high off-label use was driven by MEDTRONIC's sales force. Specifically, MEDTRONIC's marketing and sales employees directed spine surgeons to MEDTRONIC-compensated consultants or "Opinion Leaders" or "Thought Leaders" – other spine surgeons paid by enormous sums of money by MEDTRONIC – the sole purpose of which was to promote off-label uses of INFUSE®.  Through these and other illegal and improper practices, MEDTRONIC was able to increase INFUSE® sales year after year while continuing to hide and downplay  the product's dangerous side effects when used off-label in the spine.

125.    MEDTRONIC actively promoted off-label use of INFUSE® through its sales representatives and massive payments its "Opinion Leader" spine surgeon consultants, which included sponsoring   presentations at continuing medical education courses, and appearances at consulting engagements promoting off-label applications of INFUSE®.  In turn, MEDTRONIC's sales force directed other physicians to these consultants and "Opinion Leaders" or to their written work (paid for by MEDTRONIC) to further drive off-label sales of INFUSE®.  Indeed, MEDTRONIC engaged in such conduct even after its settlement of the whistleblower action with the DOJ in which it agreed to employ stricter compliance controls regarding the sale and marketing of its spine products.

126.    The MEDTRONIC Defendants, while providing spine surgeons with MEDTRONIC-funded studies and published articles purporting to support the efficacy and safety of the off-label uses, simultaneously and systematically concealed or downplayed other non-MEDTRONIC-funded studies and articles demonstrating serious and frequent adverse events caused by the same off-label uses.

127.    Several spine surgeons have already testified under oath at depositions that MEDTRONIC sales personnel overtly and directly promoted to them the off-label uses of

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

29

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

INFUSE® in the spine, and Plaintiffs are thus informed and believe that MEDTRONIC engaged in a scheme at all relevant times to expand its market share of this product by improperly encouraging such off-label uses.

128.    In this particular case, MEDTRONIC actively promoted the off-label procedures to Plaintiff's spine surgeon, and Plaintiff's spine surgeon would not have performed the off-label INFUSE® procedure in the absence of such promotion.  MEDTRONIC's off-label promotion of INFUSE® to Plaintiff's surgeon was false and misleading, in that it overemphasized the purported benefits of the off-label use, and hid, minimized, or downplayed the true risks and dangers of the off-label use, all of which were known to MEDTRONIC at all relevant times.

**I.    Off-label Promotion of INFUSE® Violates the Food, Drug, and Cosmetic Act.**

129.    The FDCA specifically provides that the FDA has no authority to "limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed [medical] device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship," and physicians are free to prescribe or use medical devices in any manner they deem medically appropriate. 21 U.S.C. § 396.

130.    Importantly, however, device and drug manufacturers, such as the MEDTRONIC Defendants, cannot actively promote products for uses not approved by the FDA. Indeed, federal law provides for significant penalties for manufacturers that promote their products in ways inconsistent with a product's labeling. Severe penalties for off-label promotion, such as fines of up to twice the amount of the gross pecuniary gain from the offense, were designed to ensure that the FDA's careful, deliberate consideration of a product's suitability for public consumption is not undermined by manufacturers seeking to circumvent that process. The MEDTRONIC Defendants are medical device companies, not physicians, and they were thus prohibited by federal law including the relevant FDA regulations, at all relevant times, from promoting to physicians or patients any off-label use of INFUSE®.

131.    Under the FDCA and its accompanying regulations, a device manufacture must include all intended uses in the label, or else a device is misbranded.  21 C.F.R. §801.4.   Under the FDCA, device manufacturers can be held liable for off-label promotion when their products

LAW OFFICES OF
**WALKUP, MELODIA, KELLY**
**& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

30

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

1    are deemed "misbranded" under the statute.  21 U.S.C. § 331(b).

2         132.    A product is "misbranded" when the directions and indications for the unapproved

3    uses that the manufacturer "intends" the product to be used for have not been included on the

4    label. See 21 C.F.R. §801.4.  Further, a device's intended uses are evidenced by the

5    manufacturers' conduct, not by reference to what the FDA has approved. Id. A product's intended

6    uses can be derived from oral statements by persons speaking on behalf of a company about its

7    product. In other words, a manufacturer can be liable under the FDCA if its conduct demonstrates

8    intent to encourage product use inconsistent with or outside the scope of the product's approved

9    label. Id.

10        133.    The FDCA's accompanying regulations require that medical devices sold by

11   manufacturers have adequate directions for use, 21 C.F.R. §801.5, and failure to have adequate

12   instructions for use is considered" misbranding," 21 U.S.C. § 352(f), which is prohibited.  21

13   U.S.C. § 331(b).

14        134.    The FDCA requires medical device manufactures to disclose all material facts in

15   advertising and labeling,  21 U.S.C. §321(n), and false or misleading labeling is considered

16   "misbranding," 21 U.S.C. § 352(a), (q)(1), which is prohibited.  21 U.S.C. § 331(b).

17        135.    Further, the FDCA requires medical device manufactures to maintain and submit

18   information as required by regulation, 21 U.S.C. § 360i, including submitting adverse event

19   reports, 21 C.F.R. § 803.50, and establishing internal procedures for reviewing complaints and

20   event reports. 21 C.F.R. § 820.198(a).

21        136.    MEDTRONIC violated these FDCA statutes and accompany regulations by

22   promoting INFUSE®   for off-label uses, and by failing to account for adverse events and update

23   its labeling, directions for use, and advertising to account for the adverse events resulting from

24   these off-label uses.

25        137.    MEDTRONIC's violation of these FDCA statutes and accompany regulations, as

26   discussed above, constitutes violation of the state law tort causes of action alleged in this

27   Complaint, as set forth below.

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

31
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

1    138.    MEDTRONIC's violation of the FDCA statutes and accompany regulations, as

2  discussed above, directly caused or significantly contributed to the off-label use of INFUSE®

3  generally, and directly caused or significantly contributed to the off-label use of INFUSE® in this

4  particular Plaintiff, and MEDTRONIC's misconduct in this regard thus caused or contributed to

5  Plaintiff's injuries and damages.

6    **J.    MEDTRONIC Settles Whistleblower Litigation with the DOJ and Agrees to Enter into a Corporate Integrity Agreement**

7

8    139.    The MEDTRONIC Defendants were named as defendants in two qui tam actions,

9  United States ex rel. (UNDER SEAL) v. MEDTRONIC. Inc., et al., Civil Action No. 02-2709 (W.

10  D. Tenn. 2002) (hereinafter "[Under Seal]"), and United States ex rel. Poteet v. MEDTRONIC,

11  Inc., et al., Civil Action No. 03-2979 (W. D. Tenn. 2003) (hereinafter "Poteet I"), (collectively the

12  "qui tam lawsuits"), both of which alleged that MEDTRONIC violated the False Claims Act, 31

13  U.S.C. § 3729, et seq., by paying illegal kickbacks to physicians in connection with promoting the

14  off-label use of INFUSE® in the spine, which resulted in the submission of false or fraudulent

15  claims to federal health care programs.

16    140.    Based on its investigation, the DOJ contended that certain of the payments,

17  services, and remuneration mentioned above were improper and resulted in the submission of false

18  or fraudulent claims in violation of violated the Federal Anti-Kickback Statute, 42 U.S.C. §

19  1320a-7b(b), et seq., which prohibits individuals from offering, soliciting or making any payment

20  or remuneration to induce business reimbursed under a federal or state health care program, and

21  the False Claims Act, 31 U.S.C. § 3729, et seq., which provides penalties for the submission of

22  false claims to the federal government. Both [Under Seal] and Poteet I were brought by

23  MEDTRONIC's former employees who made these allegations.

24    141.    In these lawsuits, the DOJ contended that between January 1, 1998 and April 30,

25  2003, MEDTRONIC made payments and provided other remuneration to a number of physicians

26  and entities in connection with its spinal products in the form of (1) payments and other

27  remuneration for physicians' attendance and expenses at medical education events, "think tanks",

28  VIP/opinion leader events, and meetings at resort locations; (2) services and payments for services

LAW OFFICES OF
**WALKUP, MELODIA, KELLY & SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

32

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

to physicians through MEDTRONIC's Healthcare Economic Services and eBusiness Departments; and (3) payments made pursuant to consulting, royalty, fellowship and research agreements with various physicians and entities

142.     Specifically, [Under Seal] was brought by a former MEDTRONIC in-house counsel, who alleged that MEDTRONIC's "aggressive and illegal" sales and marketing efforts were intended by MEDTRONIC to improperly induce physicians to use MEDTRONIC's Spinal products, including INFUSE®. The conduct alleged included, inter alia: (1) lucrative consulting and royalty agreements with physicians that used MEDTRONIC Spinal products, "the true purpose [of which were] to funnel money to the physicians so that they will be induced to use [MEDTRONIC Spinal] products;" and (2) "[l]avish all-expense paid trips to fine resorts . . . disguised as Medical Education seminars, think tanks, or discussion groups . . . held in places such as Hawaii, Cancun, Alaska, Beaver Creek, Whistler, Malaysia, Amelia Island, Teton Valley, and New Orleans at Mardi Gras . . . [t]he purpose of these lavish trips was to induce the physicians to use [MEDTRONIC Spinal] products."

143.     The complaint further alleged that: "Most of the illegal kickback practices described herein were begun by Sofamor Danek and continued by [MEDTRONIC] after the acquisition. Kickbacks were the culture and way of doing business at Sofamor Danek and the company was determined to continue that culture, and did continue that culture, when Sofamor Danek became part of the MEDTRONIC empire."

144.     Poteet I, which was brought by a former MEDTRONIC employee who was tasked by MEDTRONIC to arrange travel (including expense reimbursement) for numerous spinal surgeons to attend MEDTRONIC-sponsored events and other professional meetings. This former employee also alleged that MEDTRONIC paid surgeons substantial fees—sometimes up to hundreds of thousands of dollars per year—for consulting services that were grossly in excess of their fair market value, entered into royalty agreements that were designed to disguise illegal remuneration, and provided physicians opportunities for lavish travel and recreational activities, including "upgraded lodging for physicians, dinners, entertainment and activities such as golf, snorkeling, sailing, fishing, shopping trips, [and] horse-back riding" for using MEDTRONIC

1   products. These consulting agreements and other payments were illegitimate means of inducing

2   physicians to use MEDTRONIC products and to recommend to other physicians that they do the

3   same.

4   145.   On July 18, 2006, MEDTRONIC agreed to pay $40 million to the United States of

5   America to settle these lawsuits under the False Claims Act, 31 U.S.C. §§ 3729-3733, the Civil

6   Monetary Penalties Law, 42 U.S.C. § 1320a-7a, and the Program Fraud Civil Remedies Act, 31

7   U.S.C. §§ 3801-12.

8   146.   As part of the DOJ settlement, MEDTRONIC agreed to enter into a five-year

9   Corporate Integrity Agreement ("CIA") with the Office of the Inspector General/Health and

10  Human Services that, as MEDTRONIC described in its July 18, 2006 press release, implemented

11  substantial oversight structures and procedures meant to ensure "top-level attention to corporate

12  compliance measures." Among other things, the CIA required MEDTRONIC to establish an

13  electronic database to capture and manage all non-sales related transactions between

14  MEDTRONIC's Spinal segment and its physicians or customers, with all such transactions subject

15  to an established set of internal controls and review processes, including monitoring by

16  MEDTRONIC senior management and MEDTRONIC's Chief Compliance Officer.

17  147.   Moreover, the CIA required MEDTRONIC to implement internal policies and

18  procedures to ensure stricter regulatory compliance, which obligated MEDTRONIC to institute a

19  number of changes to improve oversight of its Spinal division.

20  148.   Significantly, the CIA required MEDTRONIC to adopt procedures to ensure that

21  any "arrangements"—a term intended to cover physician consulting agreements and broadly

22  defined as engagements involving "directly or indirectly, the offer, payment, solicitation, or

23  receipt of anything of value; [] between [MEDTRONIC] and any actual or potential source of

24  health care business [e.g., physicians]"—would not violate federal law. Such procedures were to

25  include, among other things: (1) creating a database of all existing and new or renewed

26  arrangements; (2) tracking remuneration from MEDTRONIC to all other parties to such

27  arrangements; (3) tracking service and activity logs to ensure that parties to an arrangement are

28  performing their duties under the applicable arrangement; (4) implementing procedures that ensure

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

34

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

1   all arrangements are reviewed for adherence to the Anti-Kickback Statute; and (5) regular (at least

2   quarterly) review by the MEDTRONIC Compliance Officer of the arrangements database along

3   with reporting (at least quarterly) to the MEDTRONIC Compliance Committee.

4        149.   The CIA and the previous whistleblower and wrongful termination litigation,

5   placed MEDTRONIC and its agents on actual notice that its practice of marketing, and promoting

6   INFUSE® for off-label uses was improper and required wholesale change to avoid further

7   adverse regulatory action or other liability.

8        150.   Also, as a result of this settlement, MEDTRONIC agreed to negotiate with

9   representatives of the National Association of Medicaid Fraud Control Units to reach an

10  agreement that provides for distribution of certain sums to the several states with which

11  MEDTRONIC agreed to a settlement concerning the conduct at issue in the False Claims lawsuits.

12       151.   Nonetheless, MEDTRONIC's unlawful practices continued, as did

13  MEDTRONIC's aggressive efforts to drive INFUSE® sales by promoting off-label applications,

14  such as precisely those used on the Plaintiff.  MEDTRONIC has continued to improperly and

15  illegally promote the off-label use of INFUSE® for non-FDA-approved uses of the product.

16  Indeed, they were motivated to do so knowing that, absent off-label use, sales of INFUSE® would

17  dramatically decline.  Fearing such a decline, MEDTRONIC continued to covertly employ the

18  same lucrative "consulting" arrangements and other unlawful conduct to promote off-label uses of

19  INFUSE®.

20       152.   As a result of MEDTRONIC's undisclosed misconduct, the percentage of off-label

21  INFUSE® usage increased over time, including after the DOJ settlement on July 14, 2006.  By

22  2011, off-label use of INFUSE® constituted more than 90% of the total use of INFUSE® in spinal

23  fusion procedures.

24       153.   Indeed, MEDTRONIC's unlawful conduct was so effective that a MEDTRONIC

25  analyst from Bernstein Research noted in a November 21, 2006 report that analysts were

26  "expecting continued indication expansion (e.g., recent dental approval and likely approval for

27  posterior lateral fusion) for INFUSE® to be the main driver for the spinal business in the mid-

28  term." (Emphasis added.) What this analyst and the public at large did not know was that, despite

LAW OFFICES OF
**WALKUP, MELODIA, KELLY & SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

35

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

1  the limited FDA-approved applications of INFUSE®, MEDTRONIC continued to drive sales

2  solely through off-label indications; and were doing so in spite of the CIA, the material risk of

3  further regulatory action or other liability, and in conscious disregard for the health and welfare of

4  spine patients such as the Plaintiff.

5        **K.**      **Testimony of Former MEDTRONIC Employees Regarding Off-label Promotion of INFUSE® in a Shareholder Derivative Action Against**

6              **MEDTRONIC.**

7       154.    A federal securities lawsuit filed on behalf of the Minneapolis Firefighters' Relief

8  Association against MEDTRONIC, *Minneapolis Firefighters' Relief Assoc. vs. MEDTRONIC,*

9  *Inc.,* Civil No. 08-6324 (PAM/AJB) (D.Minn., 2009), also alleged evidence of MEDTRONIC's

10  egregious campaign of off-label promotion of INFUSE®, even after the CIA.  MEDTRONIC's

11  actions, described by the "Confidential Witnesses" ("CW"), included:

12       155.    MEDTRONIC-sponsored physician meetings, during which MEDTRONIC would

13  employ paid consultants – typically surgeons hand selected by MEDTRONIC – to present off-

14  label presentations to local physicians. CW1, Consolidated Class Action Complaint dated August

15  21, 2009, at ¶ 93.

16       156.    MEDTRONIC's instructions to its sales representatives regarding various off-label

17  uses of INFUSE®, including how much of the biologic to use with off-label cervical fusions, the

18  purpose of which was to instruct physicians regarding off- label uses. CW1, Id. at ¶ 94.

19       157.    MEDTRONIC's directions to its sales representatives that they be present during

20  off-label INFUSE® surgeries "to assist and direct and give advice when asked." CW1, Id. at ¶ 95;

21  CW2, Id. at ¶ 97; CW5, Id. at ¶ 101; CW6, Id. at ¶ 102.

22       158.    MEDTRONIC's creation of sales quotas that were described by the CWs as

23  impossible to reach without pushing off-label use. CW1, Id. at ¶ 95; CW9, Id. at ¶ 105; CW11, Id.

24  at ¶ 107; CW12, Id. at ¶ 108.

25       159.    MEDTRONIC sales representatives' references to data from published literature

26  (presumably funded by MEDTRONIC) when questioned by surgeons, the purpose of which was

27  to provide surgeons with information regarding proffered techniques for off-label procedures and

28  to educate them regarding off-label uses. CW2, Id. at ¶ 96.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

36

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

160.    MEDTRONIC's development of smaller-sized Bone Graft kits under the guise of selling them for FDA-approved uses, when, in actuality, MEDTRONIC had designed them to be used in off-label cervical fusion surgeries. CW2, Id. at ¶ 97; CW7, Id. at ¶ 103.

161.    Moreover, by comparing the number of units of rhBMP-2 with the sales of the LT-Cage component – which were packaged and sold separately – CW2, 11, and 12 determined that the driving force behind MEDTRONICs $750 million in sales of INFUSE® was solely attributable to off-label uses. Although the FDA required the rhBMP-2 and LT-Cage™ to be used together, sales of the rhBMP-2 component greatly outpaced those of the LT-Cage™. component. CW2, Id. at ¶ 98; CW11, Id. at ¶ 107; CW12, Id. at ¶ 108.

162.    When questioned by a physician about how to use INFUSE® off-label, MEDTRONIC sales representatives directed physicians to other surgeons who used the product off-label and also would demonstrate or explain how to do so. CW3, Id. at ¶ 99; CW5, Id. at ¶ 101; CW6, Id. at ¶ 102; CW10, Id. at ¶ 106; CW11, Id. at ¶ 107.

163.    MEDTRONIC held quarterly meetings in at least one sales region, during which a national biologics specialist would attend to explain how to conduct off-label applications of INFUSE®. CW3, Id. at ¶ 99.

164.    MEDTRONIC directed its sales representatives to instruct physicians to use half the dose of rhBMP-2 during cervical fusion, and MEDTRONIC, aware of adverse events, instructed the representatives to tell physicians to use steroids to combat potential inflammation. CW4, Id. at ¶ 100; CW5, Id. at ¶ 101.

165.    MEDTRONIC directed physicians using the product in cervical spine fusion to throw away a large portion, sometimes up to half, of the rhBMP-2 dosage. CW6, Id. at ¶ 102.

166.    MEDTRONIC gave to physicians a small book containing no reference to MEDTRONIC, which contained information regarding the volume or dosage of rhBMP-2 that should be used for off-label applications of INFUSE®. CW7, Id. at ¶ 103; CW8, Id. at ¶ 104; CW9, Id. at ¶ 105.

167.    MEDTRONIC instructed CW8 and others during sales presentations regarding how to "get around" restrictions on off-label promotion. CW8, Id. at ¶ 104.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY**
**& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

37

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

168.    CW13 was brought into MEDTRONIC to develop a marketing plan; which included: a) Development of a "referral marketing" campaign designed to promote the product for off-label uses via a physician referral network; b) identifying which surgeons would be targeted as part of MEDTRONIC's off-label campaign and what claims MEDTRONIC would make about the product; c) development of a "cookie- cutter" CD series that outlined MEDTRONIC's off-label campaign and included information on off-label procedures that was distributed to MEDTRONIC sales representatives. According to CW13, the referral marketing program involved having surgeons meet with other surgeons as a means of prompting discussion of off-label uses of INFUSE® Bone Graft among practitioners.  CW13 also stated that MEDTRONIC used a physician training program involving cadaver labs as a means to instruct surgeons regarding off-label applications. CW13, Id. at ¶ 109.

169.    CW13 was rebuffed for raising concerns about off-label promotion, and was told "we're paying you a lot of money to launch this. Shut your mouth and take the money. Let us worry about what is off-label or isn't." CW13, Id. at ¶ 110.

170.    A sales representative was present in the operating room during an off-label cervical procedure which lead to the patient's death. The patient's family subsequently initiated civil litigation against MEDTRONIC and the sales representative who was allegedly encouraging the off-label procedure at MEDTRONIC's behest. Id. at ¶ 111.

171.    Although MEDTRONIC is under an obligation to report all serious adverse events associated with INFUSE®, MEDTRONIC failed to report the death of this patient until three months after it occurred.  FDA guidelines recommend that a manufacturer make a minimum of three attempts to retrieve additional information regarding any adverse event. While the company filed an adverse event report with the FDA in which it noted the complications immediately following the procedure, MEDTRONIC did not inform the agency of her death until after a lawsuit was filed by the patient's family and reported in The Wall Street Journal. Id. at ¶ 112.

172.    In a separate civil suit against MEDTRONIC, a physician admitted to attending numerous national spine meetings during which off-label uses of rhBMP-2 in the cervical spine were promoted. A MEDTRONIC sales representative was in the operating room a lot when

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

38
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

performing off-label uses. He admitted to doing over 100 cervical procedures, insinuating that the MEDTRONIC sales representative was in the room for a fair number of these procedures. Id. at ¶ 113.

173.    The Minneapolis Firefighters plaintiffs also discovered the growing percentage of off-label INFUSE® usage from 2003-2007 by analyzing surgical procedural codes used by hospitals.  The results of this analysis demonstrate that off-label usage of INFUSE® was high, even from the inception of FDA approval, and increased by an astonishing 10% over the next 4 years; to wit:

| Year | Estimated On-Label Procedures | Estimated Off-Label Procedures |
|------|-------------------------------|--------------------------------|
| 2003 | 25.7% | 74.3% |
| 2004 | 20.6% | 79.4% |
| 2005 | 15.8% | 84.2% |
| 2006 | 15.3% | 84.7% |
| 2007 | 14.8% | 85.2% |

174.    Moreover, the data further demonstrate that off-label use of INFUSE® in the cervical spine grew to as much as 18% of overall INFUSE® use as of 2007, despite the known increased medical risks associated with that application.

175.    Indeed, to set sales projections for INFUSE®, CW 2 stated that MEDTRONIC's marketing department accounted for the scope and number of procedures performed, including the numbers of off-label procedures, such as PLIFs and TLIFs, to predict sales projections. This analysis was based, in part, on data purchased from market research companies demonstrating the number of procedures involving different areas of the spine, e.g., certain lumbar (on- or off-label) versus cervical (off-label). Once MEDTRONIC determined its sales projections, these figures were incorporated into a budget presented to MEDTRONIC's senior management. Importantly, the final sales quotas for INFUSE® were dictated by MEDTRONIC senior management, and were far in excess of what MEDTRONIC's Spinal Division's projections indicated, or could be achievable absent promotion of the product for off-label uses.  According to CW 2, "when the numbers came back down, they never reflected the projections. They were much larger."

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

39

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

176.    Numerous confidential witnesses, including CWs 1, 9, 12 and CW 14 (a senior manager for MEDTRONIC's Spinal and Biologics division from 2005 to 2008), confirm the intense pressure MEDTRONIC's management placed on its sales representatives to meet the sales quotas the company set.  Like CW 2, CW 14 explained that sales goals were set by a handful of MEDTRONIC executives, and that they were "very, very, very aggressive." Likewise, CW 12 stated that there was a lot of pressure on MEDTRONIC's Spinal and Biologics division to reach unreasonable sales targets.

177.    As demonstrated, by years 2006-07, off-label uses accounted for an astounding 85% of INFUSE® sales; a fact known or recklessly disregarded by all employees, who reviewed marketing data and analyses to set sales quotas for INFUSE®. Indeed, sales quotas for INFUSE® required sales to grow 20% year-over-year, and MEDTRONIC knew that such increases could not be achieved without substantial off-label sales, and thus that such aggressive targets would encourage off-label promotion by its employees and representatives.

**L.      MEDTRONIC's Payments to Opinion Leaders.**

178.    In addition to encouraging its sales representatives to promote off-label use of INFUSE®, MEDTRONIC also promoted the off-label use of the product through its outside physician "Opinion Leaders" to whom MEDTRONIC paid undisclosed sums in return for publishing medical journal articles and delivering presentations explaining, endorsing, and promoting off-label applications of the product.  Indeed, even after settlement with the DOJ and entry into the CIA as a result of this very activity, MEDTRONIC continued its practice of providing lucrative consulting fees to surgeons who actively promoted off-label use of INFUSE® (amounting to millions of dollars per year), often with direct involvement by MEDTRONIC's senior management.

179.    MEDTRONIC has sought to expand the off-label uses (and has succeeded in doing so) by paying large amounts of money to key "Opinion Leader" spine surgeons around the country, many of whom then published studies and articles advocating the off-label use of INFUSE® and minimizing the risks or dangers to patients of these uses.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

40
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

180.    Medical device companies look for surgeons who are known as "Opinion Leaders" and who will not only use a high volume of their products, but who can and will persuade other surgeons to use a particular device.  Opinion leaders are physicians whose opinions on medical procedures and medical devices are held in high regard by other surgeons.  If these influential physicians are willing to promote the use of a certain device, then other surgeons are likely to follow suit and use that device, sometimes including off-label uses which are illegal for the company itself to promote.

181.    Many medical device companies, including MEDTRONIC, cultivate relationships with these "Opinion Leaders," paying them handsome (and in the case of INFUSE®, sometimes seven-figure) consulting fees, travel expenses for seminars, sham or exaggerated royalty payments, and numerous other perks, to encourage these physicians to promote the use of a particular medical device.

182.    Prior to the date of Plaintiffs' spine surgery which involved off-label INFUSE®, MEDTRONIC provided millions of dollars in undisclosed payments to certain spine surgeon "Opinion Leaders" who published articles in medical journals, delivered presentations at continuing medical education courses, and appeared at consulting engagements to promote off-label applications of INFUSE® in the spine.  In turn, MEDTRONIC's sales force would direct other physicians to these consultants and "Opinion Leaders" or to their written work to further drive off-label sales of the INFUSE®.  In this way, MEDTRONIC consciously and deliberately orchestrated a campaign to end-run the FDA's 2002 approval of and labeling for the INFUSE® device.

183.    MEDTRONIC, for example, paid more than $45 million to the 12 spine surgeons who authored the first 13 studies sponsored by MEDTRONIC on INFUSE®.  Additionally, "MEDTRONIC paid a total of approximately $210 million to physician authors of MEDTRONIC-sponsored studies from November 1996 through December 2010 for consulting, royalty, and other miscellaneous arrangements."  Staff Report on MEDTRONIC'S Influence on INFUSE® Clinical Studies, U.S. Senate Committee on Finance, October 25, 2012.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1       **1.      Walter Reed "Opinion Leaders:" Timothy Kuklo, M.D., Rick Sasso, M.D., and David Polly, M.D.**

2

3       184.    Just one of MEDTRONIC's highly compensated "consultants"—Dr. Timothy

4   Kuklo, a former Army physician who retired from the military as chief of orthopaedic surgery at

5   Walter Reed Army Medical Center ("Walter Reed"), the nation's premier military research

6   hospital in December 2006—received hundreds of thousands of dollars per year in fees in the

7   years following the DOJ settlement. Specifically, The Wall Street Journal and New York Times

8   reported in 2009 that Dr. Kuklo received $356,242 in 2007, $249,772 in 2008 and $132,453 in the

9   first few months of 2009 from MEDTRONIC for consulting, speaking, travel, and training

10  services.  MEDTRONIC paid Dr. Kuklo $42,627 in 2006 while he was still on active duty at

11  Walter Reed, as well as amounts totaling $42,295 from 2001 through 2005, primarily for travel to

12  medical conferences and speeches at MEDTRONIC events, including direct payments to hotels

13  and airlines. MEDTRONIC confirmed that Dr. Kuklo was a paid consultant for MEDTRONIC

14  and that the company has paid him over $800,000 over an eight year period.

15      185.    While it is not inherently illegal or unethical for physicians to perform paid

16  consulting work for medical device companies, the history of the growing INFUSE® scandal

17  demonstrates an egregious pattern of both MEDTRONCI and its "Opinion Leaders" overstepping

18  ethical lines while recklessly promoting dangerous off-label uses of this product.   Dr. Kuklo, for

19  example, worked closely with MEDTRONIC as an active promoter of off-label uses of

20  INFUSE®; that is, until a U.S. Army investigation into a falsified study touting the benefits of

21  INFUSE® uncovered shocking misconduct by this former Army surgeon. For example, Dr. Kuklo

22  appeared as a "distinguished guest surgeon" at a MEDTRONIC Spine Division Business

23  Overview Conference Call on September 28, 2006, alongside another MEDTRONIC consultant,

24  Dr. Rick Sasso—who received $150,000 in consulting fees in 2006—as well as Ellis and Peter

25  Wehrly ("Wehrly"), MEDTRONIC Spinal Division Senior Vice President . During the call, a

26  Merrill Lynch analyst asked about "issues that have come up in the past in terms of potential side

27  effects with using INFUSE® in the cervical region," and whether such off-label use was a concern

28  for surgeons.  Dr. Sasso responded by referring to a "Level 1, controlled randomized study which

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

1   was published in 2002" which, according to Dr. Sasso, demonstrated that "when you used the

2   appropriate dosage of INFUSE®, you did not get problems with esophageal obstruction and

3   problems swallowing." For his part, Dr. Kuklo responded that the question "was well answered as

4   far as appropriate dosage. I think it's really the bottom line."

5         186.   Although Dr. Kuklo's and Dr. Sasso's rendition of the medical literature may not

6   have been entirely accurate—in fact they baldly misrepresented the seriousness of the adverse

7   events that Defendants knew were occurring in the cervical spine—their misrepresentations only

8   hinted at the influence of MEDTRONIC's payments on its consultants' medical judgment. Indeed,

9   an Army investigation later revealed that Dr. Kuklo deliberately falsified data by exaggerating the

10  benefits of off-label use of INFUSE® in a study published in the August 2008 issue of The

11  Journal of Bone and Joint Surgery.

12        187.   Dr. Kuklo's "study," which purported to compare fusion results of 67 patients who

13  received an autogenous bone graft versus 62 that were treated with INFUSE® to treat certain tibial

14  (shin bone) fractures in injured soldiers (including certain off-label uses), reported that employing

15  INFUSE® resulted in "strikingly" better outcomes than a traditional (autogenous) bone graft.

16  Specifically, Kuklo reported that those receiving autogenous bone grafts had successful fusions in

17  76% of procedures, while the union rate for the INFUSE® group was significantly better at 92%;

18  a claimed "striking finding."

19        188.   According to Dr. Kuklo, not only were the reported union rates claimed better with

20  INFUSE® than with an autograft, but, according to this (falsified) study, patients who received

21  INFUSE® also reportedly experienced favorable outcomes in other clinical measures.

22  Specifically, the study concluded that "the primary outcome measures of union, rate of infection,

23  and reoperation were all improved with rhBMP-2," and that those treated with INFUSE® had a

24  "strikingly lower infection rate (3.2%), which we believe is directly attributable to rhBMP-2."

25        189.   MEDTRONIC continued paying Dr. Kuklo as a consultant even after his article

26  was discovered to be largely fabricated and thus retracted by The Journal of Bone and Joint

27  Surgery. Indeed, MEDTRONIC only placed Dr. Kuklo on "inactive status" after reports that he

28  had falsified the study's data were published in The New York Times.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY**
**& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

43

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

190.     On May 13, 2009, The New York Times reported that the U.S. Army's investigation into a study authored by Dr. Kuklo concluded that he falsified an entire study touting the benefits of INFUSE® to treat wounded soldiers injured in Iraq – conduct that Col. J. Edwin Atwood, an Army physician who led the Army's inquiry, described as "the ultimate tragedy and catastrophe in academic medicine."

191.     Per The New York Times and The Wall Street Journal, the true facts regarding Dr. Kuklo's study were only uncovered when one of the study's supposed "co-authors," Lt. Col. Romney C. Andersen, was congratulated on its publication by a colleague. After this discovery, Lt. Col. Andersen alerted Army investigators who found that:

192.     Dr. Kuklo listed four other Army surgeons as "co-authors" without their knowledge, and these four physicians did not participate in or review the article's preparation or submission for publication;

193.     The signatures of the four physicians listed as co-authors on the copyright release forms submitted to The Journal of Bone and Joint Surgery were forged by Dr. Kuklo;

194.     The number of cases cited by Dr. Kuklo in the article differed from the number of cases contained in the U.S. Army's wartime casualty database, with no explanation for the discrepancies in the article;

195.     Contrary to Army policy, Dr. Kuklo did not obtain publication review or clearance from Walter Reed prior to submitting the article for publication; and

196.     The published results of the article suggested a much higher efficacy rate for INFUSE® than is supported by the experience of the purported co- authors.

197.     According to one of the Army's investigators, Col. Norvell V. Coots, the study cited higher numbers of patients and injuries than the hospital could account for.  According to Col. Coots, "It's like a ghost population that were reported in the article as having been treated that we have no record of ever having existed … this really was all falsified information."

198.     After receiving correspondence from Walter Reed dated November 6, 2008 stating that Dr. Kuklo did not follow Army regulations in submitting the article, that the signatures of the purported co-authors had been forged, and that the article's purported co- authors had questioned

LAW OFFICES OF
**WALKUP, MELODIA, KELLY & SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

44

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

1  the study's findings, The Journal of Bone and Joint Surgery formally retracted the article and

2  banned Dr. Kuklo from submitting further papers to The Journal of Bone and Joint Surgery. As

3  noted in a May 19, 2009 follow-up article in The New York Times, when questioned about its ties

4  to Dr. Kuklo, MEDTRONIC repeatedly declined to disclose when it began its financial

5  relationship with him or the extent of funding it provided.

6      199.    As discussed in more detail supra, U.S. Senator Charles Grassley discovered that

7  Dr. Kuklo's name did not appear on a list of paid consultants for INFUSE® provided by

8  MEDTRONIC that the Senator had requested in a September 30, 2008 letter to MEDTRONIC.

9  Senator Grassley disclosed the list MEDTRONIC provided—which included 22 physicians who

10 were paid a total of $943,000 from 2005 to 2008—in a May 18, 2009 letter to MEDTRONIC that

11 was published in the Congressional Record the following day.  According to the May 18, 2009

12 letter, Senator Grassley was "concerned" that MEDTRONIC did not provide Dr. Kuklo's name in

13 response to his inquiry that specifically requested information regarding consultants who work on

14 INFUSE®, as it was "clear that Dr. Kuklo had some sort of consulting agreement" and was named

15 in The New York Times as a consultant on INFUSE®. Indeed, by this time, Dr. Kuklo had given

16 countless presentations on behalf of MEDTRONIC about off-label use of the product.

17     200.    The list provided to Senator Grassley also omitted names of other MEDTRONIC

18 consultants who had promoted off-label uses of INFUSE®, such as David Polly, M.D., another

19 former Walter Reed surgeon.  Frustrated with MEDTRONIC's omissions, Senator Grassley stated

20 that "[i]n the future, I hope that instead of not providing me with the name of the physician

21 involved in INFUSE®, or any other matter that I am looking into, that MEDTRONIC contact me

22 to avoid the situation in which we find ourselves." A May 19, 2009 New York Times article

23 reported that MEDTRONIC also faced a DOJ inquiry regarding its illegal promotion of

24 INFUSE®.

25     201.    As a result, on June 18, 2009, MEDTRONIC disclosed to The Wall Street Journal

26 that Dr. Kuklo had received almost $850,000 in payments from MEDTRONIC over the past 10

27 years, the majority of which—nearly $800,000— were made in the preceding three years when

28 Dr. Kuklo was shopping his bogus fabricated study on INFUSE® to medical journals.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY**
**& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

45

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

Specifically, MEDTRONIC paid Dr. Kuklo $356,242 in 2007, the year Dr. Kuklo sought publication of the study in two medical journals, and $249,772 in 2008, the year the study was published in the Journal of Bone and Joint Surgery.  MEDTRONIC made both of these payments after MEDTRONIC announced the settlement with the DOJ in July 2006.

202.    In July 2009, Senator Grassley also publicly disclosed information demonstrating that Dr. Kuklo hid his financial relationship from Washington University and failed to disclose his financial ties in conflict-of-interest disclosure forms while he was conducting research related to INFUSE®.  In fact, MEDTRONIC financed two separate, unpublished studies that also examined the use of INFUSE® on Walter Reed patients with combat-related leg injuries while Dr. Kuklo was supposedly conducting research for the falsified study. At the time Washington University approved the study protocols, Dr. Kuklo indicated on disclosure forms that he did not receive any payments from MEDTRONIC when, in fact, Dr. Kuklo signed a contract with MEDTRONIC shortly after joining the University faculty and had received payments from MEDTRONIC for almost a year into his research.

203.    In mid-2007, after Dr. Kuklo disclosed to Washington University that he had received funding from MEDTRONIC, the University's internal disclosure review board re-reviewed Dr. Kuklo's involvement in the MEDTRONIC-sponsored studies and informed him he would have to reduce his personal financial interest with MEDTRONIC to less than $10,000 per year or discontinue his involvement with the research. Dr. Kuklo opted to stop the two studies, which were closed in February 2008.

204.    Another highly compensated MEDTRONIC consultant involved in the promotion of off-label INFUSE® use, Dr. Polly, a professor and Chief of the Spine Service at the University of Minnesota Department of Orthopaedic Surgery, received consulting fees from MEDTRONIC totaling $1.14 million from 2003 to 2007. As with Dr. Kuklo, MEDTRONIC's financial relationship with Dr. Polly began while the surgeon was on active military duty at Walter Reed. Although Dr. Polly has claimed that his consulting relationship with MEDTRONIC did not begin until 2004, documents obtained through requests under the Freedom of Information Act ("FOIA") reveal that MEDTRONIC paid almost $30,000 in travel expenses for Dr. Polly to speak at various

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

46

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

medical conferences in the Bahamas, San Diego, and a $10,000 trip to Switzerland, while he was stationed at Walter Reed in 2003. Dr. Polly attended these conferences to report on his research that purportedly demonstrated that INFUSE® was more cost effective than traditional spinal fusion procedures.

205.    After his discharge from the military, Dr. Polly authored an article with Dr. Kuklo reporting positive results in treating wounded soldiers with rhBMP-2 at Walter Reed. According to their article, published in the November 2004 issue of Minnesota Medicine, rhBMP-2 was used in more than 100 military patients with traumatic bone fractures who had served in Iraq and Afghanistan. Although the use of INFUSE® in tibial fractures was not approved until April 30, 2004, Dr. Polly reported that the "decision to use rhBMP-2 was made early in the Afghanistan conflict and was based on evidence from clinical trials in Europe on open tibial fractures that suggested use of rhBMP-2 not only improved bone healing but led to a decreased number of secondary interventions and lower rates of infection." According to Dr. Polly, "the military's experience with rhBMP-2 has been favorable."

206.    Moreover, additional evidence demonstrates that, even before his and Dr. Polly's November 2004 article was published, MEDTRONIC reimbursed Dr. Kuklo for a meeting with MEDTRONIC representatives in Memphis, Tennessee on April 20, 2004 regarding "Review of BMP Trauma and Spine Surgery."

207.    Dr. Polly later sought a government grant for a similar study in May 2006, when he testified before the Defense Subcommittee of the U.S. Senate Appropriations Committee regarding research that would examine the use of INFUSE® and antibiotics to treat traumatic and infected bone fractures. Dr. Polly stated that he was "speaking on behalf of the American Academy of Orthopedic Surgeons." However, according to information recently released by Senator Grassley, who, in conjunction with Senator Baucus, has been conducting an inquiry into MEDTRONIC's consulting payments, Dr. Polly actually billed MEDTRONIC $7,000 in connection with his Senate testimony, and was therefore speaking on behalf of MEDTRONIC, not the American Academy of Orthopedic Surgeons, as he had claimed. Furthermore, Dr. Polly billed MEDTRONIC a total of $50,000 over several months for his lobbying efforts in securing the

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

47

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

1   $466,644 Department of Defense grant for this INFUSE® research study.

2       208.    The information released by Senator Grassley, discussed more fully supra, which

3   includes billing reports submitted to MEDTRONIC by Dr. Polly and approved by MEDTRONIC,

4   indicates that throughout this period, Dr. Polly had frequent meetings, telephone calls, and email

5   correspondence with numerous MEDTRONIC senior executives, including former COO Michael

6   DeMane ("DeMane"), and former President of MEDTRONIC Spinal and Biologics Wehrly, while

7   speaking frequently regarding INFUSE® at medical conferences and other events.  For example,

8   the records show meetings and other contacts between Dr. Polly and Hawkins on the following

9   dates: February 13, 2007; June 15, 2007; July 27, 2007; August 8, 2007; August 24, 2007;

10  September 26, 2007; and September 27, 2007. Indeed, they further show that Dr. Polly billed

11  MEDTRONIC for a meeting with Hawkins on July 13, 2005 to discuss a "spine surgery advocacy

12  effort."

13              **2.      Opinion Leader Dr. Thomas A. Zdeblick.**

14      209.    Thomas A. Zdeblick, M.D., the Chairman of the Department of Orthopedics and

15  Rehabilitation at the University of Wisconsin, received over $19 million from MEDTRONIC from

16  2003 to 2007 for consulting services and royalty payments. Although Dr. Zdeblick only disclosed

17  annual payments exceeding $20,000 in University conflict of interest forms, he actually received

18  between $2.6 and $4.6 million per year. In 2007 alone, Dr. Zdeblick received $2,641,000 in

19  consulting fees from MEDTRONIC. From 1998 through 2004, Dr. Zdeblick was paid an annual

20  salary of $400,000 by MEDTRONIC under a contract that only required him to work eight days

21  per year at a MEDTRONIC site in Memphis, Tennessee, and to participate in "workshops" for

22  surgeons.

23      210.    Dr. Zdeblick also has been a significant contributor to MEDTRONIC's promotion

24  of INFUSE®, authoring seven peer-reviewed articles on rhBMP-2 and appearing as a presenter at

25  medical conferences and symposia in which the topics included discussion of off-label uses of the

26  product. On a MEDTRONIC-owned website, "www.Back.com," Dr. Zdeblick describes the

27  advantages of INFUSE® and appears in an online video discussing the benefits of the product.

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

48
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

211.    As discussed more fully supra, on January 16, 2009, The Wall Street Journal reported on a letter sent by Senator Charles Grassley to Kevin P. Reilly, President at the University of Wisconsin, regarding Defendants' consulting and royalty payments to Dr. Zdeblick, who co-authored preliminary studies that led to the FDA's approval of INFUSE®. Although the University is required to monitor its researchers' financial conflicts-of-interest, the amounts MEDTRONIC paid Dr. Zdeblick far exceeded those he reported to the University. Specifically, Dr. Zdeblick was required to disclose annual amounts in excess of $20,000 per year, and in one year reported payments in excess of $40,000. In reality, Dr. Zdeblick received between $2.6 million and $4.6 million per year from MEDTRONIC, totaling an astonishing $19 million in payments, from 2003 through 2007.

212.    As revealed in a June 20, 2009 article in the Milwaukee Journal Sentinel, Dr. Paul A. Anderson, an orthopedic surgeon and colleague of Dr. Zdeblick at the University of Wisconsin School of Medicine and Public Health, was paid $150,000 by MEDTRONIC for just eight days of work. Dr. Anderson, along with MEDTRONIC consultants Drs. Boden, Keith H. Bridwell, and Jeffrey C. Wang, authored a July 2007 article in Journal of Bone and Joint Surgery article, titled "What's New in Spine Surgery." The article discussed, among other things, a study that examined the use of INFUSE® in an off- label Posterolateral Fusion procedure. According to the authors, the study reported that INFUSE® improved fusion rates when used in combination with iliac crest bone graft in a procedure in which the BMP was wrapped around local bone as a bulking agent. According to the authors, the study's findings suggested that "the current [INFUSE®] kit, while likely not sufficient as a stand-alone graft substitute for the posterolateral spine, can provide a significant enhancer effect, improving the success of an autogenous bone graft."

213.    On June 20, 2009, the Milwaukee Journal Sentinel reported that, during calendar year 2008, MEDTRONIC paid Dr. Zdeblick $2 million in royalty payments for eight days of consulting work, and that Dr. Paul Anderson received $150,000 in MEDTRONIC consulting fees for working just eight days.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

49
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

### 3.     Norton Hospital Leatherman Spine Center Opinion Leaders.

214.     Another set of highly compensated surgeons, those affiliated with the Norton Hospital Leatherman Spine Center in Louisville, Kentucky, collectively received over one million dollars in consulting fees in 2006 alone, including Drs. John R. Johnson ($162,750), Steven D. Glassman ($200,300), Rolando M. Puno ($106,000), John R. Dimar, II ($192,300), David Rouben ($109,300), Mitch Campbell ($212,000) and Mladen Djurasovic ($55,900).

215.     According to CW 1, several surgeons from the Leatherman Spine Center were requested by MEDTRONIC to speak at MEDTRONIC-sponsored physician talks attended by between 10 and 25 surgeons, including several "pretty high profile" physicians.  At these physician talks a MEDTRONIC consultant, such as one of the surgeons at the Leatherman Spine Center, provided presentations covering of off-label usage of INFUSE®.  According to CW 1, "What [MEDTRONIC] would do is bring in one of their 'paid consultants' and set up a dinner in the area and invited a number of physicians to attend." The guest surgeon—the "paid consultant"— would then "basically give a presentation on off-label usage." Importantly, these physician talks were also attended by all MEDTRONIC sales representatives who worked in the area.

216.     These same MEDTRONIC-funded surgeons associated with the Leatherman Spine Center have also written extensively on off-label uses of INFUSE®.   These surgeons have collectively authored at least 15 articles addressing the use of BMP, including many of the early medical articles on the use of INFUSE® in off-label posterolateral lumbar and anterior cervical fusion procedures. Specifically, Dr. Campbell has contributed to at least eight articles examining the use of BMP; Dr. Dimar has authored nine; Dr. Djurasovic, four; Dr. Johnson, five; Dr. Puno, five; and Dr. Glassman has written at least fifteen articles addressing the use of BMP, the vast majority of which involve applications of the product in off-label procedures.

### 4.     Other Various Opinion Leaders.

217.     Several physicians who authored a May 2003 article describing positive results of INFUSE® used in the cervical spine were paid tens of thousands of dollars in consulting fees by MEDTRONIC. The article, "New Technologies in Anterior Cervical Spine Fixation," published

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

50
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

on SpineUniverse, a website intended for the general public that provides information regarding spinal disorders and treatment, described the physicians' use of INFUSE® "in the cervical spine with very good results." According to the authors, "[p]reliminary results are promising and INFUSE® may be especially appropriate in people undergoing multiple level fusions" (emphasis added)—i.e., for indications outside FDA limited approval to single-level fusion procedures.

218.    One of the authors of this article, Dr. Regis Haid, Jr., received MEDTRONIC consulting fees of $50,000 in 2006 and similar amounts in the previous two years. Another author, Dr. Gerald Rodts, received payments of $80,000 from MEDTRONIC in 2006 and similar amounts in the previous two years. The SpineUniverse article does not mention that its authors received compensation from MEDTRONIC, nor do the website profiles of Dr. Haid and Dr. Rodts, both of whom serve on the publication's editorial board, disclose their financial ties to MEDTRONIC.

219.    Dr. Haid was also the lead author of an article describing the results of the study of INFUSE® in off-label PLIF procedures that was halted in December 1999 after several patients experienced adverse incidents of uncontrolled bony overgrowth. In addition, two of the article's other authors—Dr. J. Kenneth Burkus and Dr. Charles L. Branch—received consulting fees from MEDTRONIC. Specifically, MEDTRONIC paid Dr. Branch $154,900 in 2006 and similar amounts in the preceding two years, while Dr. Kenneth Burkus—who has written over a dozen articles addressing the use of rhBMP-2, including studies examining the use of INFUSE® in off-label PLIF and anterior cervical procedures—received $416,775 in 2006 and similar amounts in the two preceding years.

220.    Although the negative outcomes in the PLIF study prompted the FDA Advisory Panel to recommend a more restrictive labeling and indication in approving INFUSE®, the MEDTRONIC-funded authors reviewing the study's results surprisingly did not find the incidents of bony overgrowth to be a clinically significant concern. Shockingly, the physicians noted, "[a]lthough not desirable, bone formation in the spinal canal does not appear to have a discernible effect on patient outcomes," and "the de novo rhBMP-formed bone occurred predictably, not compressing the neural structures."

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

51
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

221.    In a commentary on the study, Dr. Neil Kahanovitz, an independent surgeon, questioned the authors' interpretations, suggesting that they may have been "overwhelmed by their enthusiasm of using" rhBMP-2 in a PLIF procedure. Dr. Kahanovitz noted that, while there are "lengthy discussions of various trends throughout this study, which imply the superiority of rhBMP over autograft . . . one fact remains: in every clinical measure examined in this study, there were no statistically superior outcomes in the rhBMP group except one, and the clinical significance of this one statistically significant finding is unclear."

222.    Importantly, Dr. Kahanovitz also disagreed with the authors' conclusion that the presence of bone growth in the spinal canal and foramina (the two apertures between vertebrae) in those patients who received rhBMP-2 had no clinical implications.  Rather, Dr. Kahanovitz predicted that "most surgeons would be less than enthusiastic to see this statistically significant variable present in the majority of their patients."

223.    CW 1 stated that Drs. Lawrence "Larry" G. Lenke and Keith H. Bridwell, two surgeons from Washington University in St. Louis – where Dr. Kuklo worked as an associate professor until recently – similarly acted as "Opinion Leaders" or "guest surgeons" during "corporate visits" in which MEDTRONIC would invite targeted surgeons to attend training sessions in Memphis, Tennessee. While in Memphis, the visiting surgeons met with MEDTRONIC corporate officers, product managers, and guest surgeons, such as Drs. Lenke and Bridwell.  The visiting surgeons also received "hands-on training" on INFUSE®, including instruction in cadaver labs. According to CW1, who personally attended two such meetings, "[t]here was training on off- label procedures, for sure." The visiting surgeons "would bring up the use of INFUSE® and ask how to use it, and [the guest surgeons] would show them how to do it." CW1 stated that MEDTRONIC chose which surgeons to invite to these corporate visits based, in part, upon the volume of INFUSE® procedures they performed.

224.    Another prominent MEDTRONIC consultant, Jeffrey Wang, M.D., the Chief of Spine Surgery for the Department of Orthopaedic Surgery and Executive Co-Director of the University of California, Los Angeles's ("UCLA") Comprehensive Spine Center, also spoke about off-label uses of INFUSE®. Unsurprisingly, Senator Grassley recently discovered that Dr. Wang

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

52
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

1    received $275,000 in royalty and consulting payments from MEDTRONIC from 2003 until 2008.

2           225.    Furthermore, Dr. Wang failed to disclose his substantial financial relationship with

3    MEDTRONIC while researching MEDTRONIC products, which violated UCLA's policy

4    requiring him to do so.  For example, on a disclosure form to UCLA dated January 10, 2007, Dr.

5    Wang checked "no" when asked if he received income of $500 or more from MEDTRONIC,

6    notwithstanding the fact that MEDTRONIC was, at that very moment, funding one of Dr. Wang's

7    studies.  In fact, Dr. Wang received $14,600 on January 4, 2007 for "lecture and teachings at spine

8    meetings and universities in Korea for one week."  As a result of his repeated failures to disclose

9    payments received from MEDTRONIC, Dr. Wang lost his position as Executive Co-Director of

10   UCLA's Comprehensive Spine Center.

11          226.    As discussed more fully supra, Senator Grassley also discovered that, in addition to

12   the compensation to MEDTRONIC consultants, MEDTRONIC collectively paid 22 other

13   surgeons $943,000 from 2003 to 2008 to work on matters specific to INFUSE®.

14          227.    In June 2011, one of the leading journals on spine surgery, The Spine Journal,

15   described more fully supra, devoted an entire issue to publishing various articles regarding the

16   risks associated with INFUSE®, including articles on MEDTRONIC's failure to accurately report

17   the side effects from its clinical trials; MEDTRONIC's failure to report that many of the authors

18   who studied and promoted INFUSE® had significant financial ties to MEDTRONIC, with a

19   median range of $12 to $16 million per study; that INFUSE® can cause severe injuries to the

20   spinal nerves and spinal cord; that off-label use of INFUSE® can lead to other severe side effects;

21   and that MEDTRONIC and its paid consultants/study authors downplayed the risks associated

22   with INFUSE®, over-emphasized its benefits and over-emphasized the risks associated with

23   traditional non-INFUSE® spine fusion procedures.

24              **5.    U.S. Senators' Letters to MEDTRONIC Regarding to the Promotion
                       and Marketing of INFUSE®.**

25
                    **a.    September 30, 2008 Letter.**
26

27          228.    Despite the July 2006 Settlement with the DOJ, concerns regarding

28   MEDTRONIC's off-label marketing activities and related payments to doctors continued.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY**
**& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

53
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

229.     On September 30, 2008, U.S. Senator Herb Kohl sent a letter to MEDTRONIC noting that earlier in 2008, MEDTRONIC's outside counsel provided to the Special Committee on Aging a written account of MEDTRONIC's efforts to comply with the July 2006 Settlement Agreement it reached with the DOJ concerning allegations that MEDTRONIC and its subsidiary improperly compensated surgeons and physicians in connection with the INFUSE® device.

230.     Senator Kohl's letter expressed several concerns, including the following:

231.     That account also addressed the corporate integrity agreement (CIA) that MEDTRONIC and its subsidiary entered into with the Office of the Inspector General of the United States Department of Health and Human Services stemming from those same allegations. In that same letter to the Committee, MEDTRONIC and its subsidiary both denied that "improper payments were made to physicians in the first place (MEDTRONIC's agreement with DOJ does not contain any admission of liability), much less that improper payments 'have continued.'" Consequently, it was with concern that I read recent articles, in the Wall Street Journal and elsewhere, which outlined highly disturbing allegations of improper, if not illegal, payments by MEDTRONIC to surgeons and physicians.

232.     These continuing allegations are directly relevant to the Committee's oversight of inappropriate physician compensation practices within the medical device industry.  All of the major orthopedic device companies that settled with DOJ over such allegations were required to publicly reveal information related to their payments to physicians.  MEDTRONIC's response to the Committee's initial inquiry articulated no specific reasons as to why MEDTRONIC has yet to voluntarily make the same disclosures.

233.     In this letter, Senator Kohl requested both documentation of MEDTRONIC's efforts to comply with the July 2006 Settlement Agreement and interviews with corporate witnesses and documents "given the ongoing, serious concerns publicly raised regarding the integrity and transparency of MEDTRONIC's physician compensation practices."

234.     Senator Kohl also asked MEDTRONIC to explain "the circumstances that led MEDTRONIC's former counsel to file suit against the company [alleging improper payments to physicians] and how that matter was subsequently settled."

LAW OFFICES OF
**WALKUP, MELODIA, KELLY**
**& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

54
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

235.     Also on September 30, 2008, U.S. Senator Charles Grassley sent a similar letter to MEDTRONIC pertaining to the marketing of INFUSE® and allegations of related kickbacks to physicians regarding the sale of INFUSE®, noting that:

236.     Last week, the Wall Street Journal (WSJ) reported on allegations of financial perks provided to doctors that included "entertainment at a Memphis strip club, trips to Alaska and patent royalties on inventions they played no part in."   I would appreciate your assistance in better understanding these allegations and would like to take this opportunity to lay out my specific concerns and questions.

237.     Senator Grassley went on to express his concern over the Wall Street Journal's reports "that one of the incentives MEDTRONIC provided physicians was to include them on patents for medical devices and reward them with royalties, even though the physicians may not have contributed to the development of the product."

238.     This letter specifically addressed issues related to MEDTRONIC's marketing of INFUSE®:

239.     Fourth, earlier this month the WSJ reported on problems with off-label use of MEDTRONIC's INFUSE®.  INFUSE® is a bone graft replacement technology that uses a protein which creates bone.  Specifically, it was reported that MEDTRONIC gave payments to physicians, in the form of consulting agreements, as a means of increasing sales of INFUSE®.  The allegations that MEDTRONIC has been disguising these consulting agreements as inducements or kickbacks for physicians to use INFUSE® are equally troubling.  Likewise, this is a practice that I would like to better understand and I would like to know what if anything has changed since these reported events.

240.     Senator Grassley, in his September 30, 2008 letter, also questioned why several lawsuits against MEDTRONIC pertaining to INFUSE® remained under seal, and indicated that he would like to "better understand the status of these lawsuits and the procedural process that has led to the current situation."

LAW OFFICES OF
**WALKUP, MELODIA, KELLY & SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

55

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

**b.      June 21, 2011 Letter.**

241.    The U.S. Senate Committee on Finance investigated whether MEDTRONIC has continued to misrepresent the adverse events that result from INFUSE® and rhBMP-2, as well as the possibility that MEDTRONIC improperly influenced clinical trials and reporting regarding rhBMP-2.

242.    On June 21, 2011, U.S. Senators Charles Grassley and Max Baucus sent another letter to MEDTRONIC on behalf of the Senate Committee on Finance requesting that MEDTRONIC produce documents and communications pertaining to "adverse postoperative events and/or medical complications" resulting from the use of rhBMP-2.   The letter also requests that MEDTRONIC provide "[a] detailed account of payments that MEDTRONIC made to all INFUSE® clinical investigators."

243.    In their June 21, 2011 letter, Senators Grassley and Baucus state: "We are extremely troubled by press reports suggesting that doctors conducting clinical trials examining the safety and effectiveness of INFUSE® on behalf of MEDTRONIC were aware that INFUSE®, a treatment commonly used in spinal surgery, may cause medical complications, but failed to report this in the medical literature.  This issue is compounded by the fact that some clinical investigators have substantial financial ties to MEDTRONIC."

244.    The letter further states:  "We are also concerned that other severe side-effects of INFUSE® and similar bone-growth products developed by MEDTRONIC may have been unreported or under-reported in clinical literature.  Reports have linked INFUSE® to potentially fatal swelling in the neck and throat, and radiating leg pain.  Concerns have also been expressed about a potential link to cancer."

**c.      December 13, 2011 Letter.**

245.    Senators Herb Kohl, Charles Grassley, and Richard Blumenthal wrote to MEDTRONIC again in December 2011 demanding more information from the company over adverse events caused by on-label and off-label use of INFUSE®.  The letter noted that "your company has experienced safety issues, such as with your spine product INFUSE®."

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

56

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

246.     The letter also demanded that MEDTRONIC explain whether or not it requires physicians who receive funds from MEDTRONIC to disclose those payments to their patients before the patients receive one of MEDTRONIC's medical devices.  And "If not, why not?"

247.     This new letter requires that MEDTRONIC produce this information to the U.S. Senate's Special Committee on Aging by no later than January 23, 2012.

248.     On information and belief, this continued investigation by a U.S. Senate committee suggests that MEDTRONIC has not changed its ways with regard to its illegal promotion of INFUSE®, despite signing the CIA and paying a $40 million fine to DOJ in 2006.

**d.     June 1, 2011 Issue of The Spine Journal.**

249.     On June 1, 2011, the Spine Journal, a leading medical journal in the United States, published a special edition dedicated to addressing serious patient safety and ethical concerns related to the use of rhBMP-2 (INFUSE®) in the spine.

250.     This special edition reviewed thirteen peer-reviewed articles about rhBMP-2 by MEDTRONIC-sponsored authors, and concluded that these articles had inaccurately reported the safety of rhBMP-2 applications in the spine by underestimating its risks.

251.     In an editorial summarizing the findings of this special issue, five prominent physicians, including spine surgeons at Stanford University Medical Center, wrote that the earlier industry-sponsored trials and reports were "remarkable for the complete absence of reported rhBMP-2-related clinical adverse events."  For example, the industry-sponsored articles omitted mention of indications from the earliest trials of inflammatory reactions, adverse back and leg pain events, radiculitis, retrograde ejaculation, urinary retention, bone resorption, and implant displacement.  They also omitted mention of sterility and cancer risks associated with rhBMP-2, as reported in FDA documents and hearings.  The trials and reports suffered from idiosyncratic trial design, reporting bias, and peer-review/publication shortfalls.

252.     According to this editorial and several of the accompanying articles, the thirteen MEDTRONIC-funded articles reported only successful fusions and extremely low or nonexistent rates of complications with INFUSE®, which led to the growth of "off-label" use of INFUSE® in lumbar fusion procedures.  The articles "may have promoted widespread poorly considered on-

LAW OFFICES OF
**WALKUP, MELODIA, KELLY**
**& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

57

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

1    and off-label use, eventual life-threatening complications and deaths."

2        253.    Contrary to the conclusions of the earlier MEDTRONIC-sponsored trials and

3    articles, an article in this special issue of the Spine Journal suggested "an estimate of adverse

4    events associated with rhBMP-2 use in spine fusion ranging from 10% to 50% depending on

5    approach."

6        254.    Anterior cervical fusion with rhBMP-2 has an estimated 40% greater risk of

7    adverse events with rhBMP-2 in the early postoperative period, including life-threatening events.

8    After anterior interbody lumbar fusion rates of implant displacement, subsidence, infection,

9    urogenital events, and retrograde ejaculation were higher after using rhBMP-2 than controls.

10   Posterior lumbar interbody fusion was associated with radiculitis, ectopic bone formation,

11   osteolysis, and poorer global outcomes.  In posterolateral fusions, the risk of adverse effects

12   associated with rhBMP-2 use was equivalent to or greater than that of iliac crest bone graft

13   harvesting, and 15% to 20% of subjects reported early back pain and leg pain adverse events;

14   higher doses of rhBMP-2 were also associated with a greater apparent risk of new malignancy."

15       255.    Eugene J. Carragee, Eric L. Hurwitz & Bradley K. Weiner, A Critical Review Of

16   Recombinant Human Bone Morphogenetic Protein-2 Trials In Spinal Surgery: Emerging Safety

17   Concerns And Lessons Learned, the Spine Journal 11, 471-72 (2011) (emphasis added).

18       256.    This article also reported that ten of the earlier industry-sponsored rhBMP-2 trials

19   were funded in whole or in part by the manufacturer of rhBMP-2 (INFUSE®), MEDTRONIC.

20   Furthermore, in twelve of these earlier studies, the median-known financial association between

21   the authors and MEDTRONIC Inc. was approximately $12,000,000-$16,000,000 per study (range,

22   $560,000-$23,500,000).  Id. at 475.

23       257.    The following are some of the other significant conclusions in these articles in the

24   June 1, 2011 Issue of The Spine Journal:

25       258.    Many of the risks now accepted have been known since a publication by Poynton

26   and Lane in 2002, which listed overgrown and uncontrolled bone formation, osteoclast activity

27   (graft subsidence, migration, loss of fixation etc.), local safety (inflammation, edema, wound

28   problems, and infection), potential negative effect of BMPs on exposed dura and nerves

LAW OFFICES OF
**WALKUP, MELODIA, KELLY**
**& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

58

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

(neurologic events, retrograde ejaculation, persistent bladder retention, early back pain, leg pain, radiculitis, functional loss, carcinogenicity). However, it appears that these risks were ultimately washed out and marginalized by the wealth of positive data from industry-sponsored studies.

259.   A 2-year rhBMP-2 follow-up published by Burkus, et al., reported no adverse events. However, in a 6-year follow-up publication using the same subjects, the authors contradict their earlier publication stating that there had been seven early adverse events associated with subsidence in the rhBMP-2 group, yet they were not reported in the two year follow-up.

260.   In fact, on closer inspection of the Burkus studies, it was noted that all adverse events mentioned in the six-year follow-up had occurred within the first two years.

261.   Furthermore, four of the adverse events required further surgery, and 22 additional surgeries for device failures occurred in the same rhBMP-2 group between 0-2 years after surgery according to the FDA summary, but were not specifically reported in the 2003 or 2004 studies, which were the same patients over the same time frame.

262.   The estimates of rhBMP-2 safety from the original publications underestimated rhBMP-2-related adverse events of the product. In the small pilot studies, there was inadequate numbers to assess safety, but some suggestion of potential harm was seen in at least one study. In the larger trials, there is evidence in each trial that rhBMP-2 complications may be common and may be serious, but in each publication these were underreported.

263.   The presence and magnitude of conflicts-of-interest and the potential for reporting bias were either not reported or were unclear in each of the original industry sponsored studies. Some of the conflicts-of-interest statements reported appeared to be vague, unintelligible, or were internally inconsistent.

264.   The original estimates of ICBG (Iliac Crest Bone Graft, the pre-rhBMP-2 gold standard procedure for spinal fusion) harvesting morbidity were based on invalid assumptions and methodology. This in turn may have exaggerated the benefit or underestimated the morbidity of rhBMP-2 in the clinical situations tested.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY & SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

59
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

265.    The control group methods and techniques, as selected for both posterior approach methods (PLIF and PLF) were potentially handicapped by significant design bias against the controls.

266.    In those studies for which other data sources have been made available on the same patient sets (either FDA documents or subsequent reporting of follow-up data), serious contradictory findings have emerged. Major complications, additional surgeries, neurologic/urologic injury, and major back/leg pain events were apparently observed but not reported in the original articles.

267.    By reporting perfect or near perfect safety, the original studies might have led others to widespread off-label use of the product with some potentially catastrophic outcomes. Revised estimates of adverse events are:

268.    Posterior lumbar interbody fusion techniques:  25-50% risk of associated adverse events.

269.    Anterior lumbar interbody fusion:  10-15% risk of adverse events.

270.    Anterior cervical fusion:  40% greater risk of adverse events in the acute postoperative period including potentially life-threatening complications.

271.    Posterolateral fusions: equivalent or greater early postoperative risk of morbidity compared with ICBG harvesting for this dosage; 16-20% of rhBMP-2 subjects had adverse back and leg pain events, a probable two to threefold increase in the first three months after surgery over control groups (emphasis added).

272.    October 25, 2012 U.S. Senate Committee on Finance Report on MEDTRONIC'S Manipulation of the INFUSE® Studies and Close Financial Ties with Researchers

273.    On October 25, 2012, Senate Finance Committee Chairman Max Baucus (D-Mont.) and senior member Chuck Grassley (R-Iowa) released the results of their 16-month investigation into MEDTRONIC, which revealed questionable ties between the company and its physician "Opinion Leader" consultants tasked with testing and reviewing INFUSE®.  Without public disclosure of their roles, MEDTRONIC employees collaborated with the physician authors to edit – and in some cases, write – segments of published studies on INFUSE®.  The studies may have

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

60
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

1    inaccurately represented INFUSE®'s risks and may have overemphasized the side effects of prior

2    more traditional treatments.  The Senate report found that MEDTRONIC  also maintained

3    significant, previously-undisclosed financial ties with the physicians who authored the early

4    studies on INFUSE®, making $210 million in payments to physicians over a 15-year period.

5            274.    "MEDTRONIC'S actions violate the trust patients have in their medical care.

6    Medical journal articles should convey an accurate picture of the risks and benefits of drugs and

7    medical devices, but patients are at serious risk when companies distort the facts the way

8    MEDTRONIC has," Senator Baucus said.  "Patients everywhere will be better served by a more

9    open, honest system without this kind of collusion."

10           275.    "These findings emphasize the value of the Grassley-Kohl Physician Payments

11   Sunshine Act, which will result in public disclosure of industry payments to physicians starting

12   next year.  The findings also should prompt medical journals to take a very proactive approach to

13   accounting for the content of the articles along with the authorship of the articles and studies they

14   feature," Grassley said.  "These publications are prestigious and influential, and their standing

15   rests on rigorous science and objectivity.  It's in the interest of these journals to take action, and

16   the public will benefit from more transparency and accountability on their part."

17           276.    The report released on October 25, 2012 by Senators Baucus and Grassley on

18   behalf of the U.S. Senate Finance Committee – which has sole jurisdiction over Medicare and

19   Medicaid – was the product of an investigation they began in June 2011.   The major findings of

20   the investigation include:

21           277.    MEDTRONIC was involved in drafting, editing, and shaping the content of

22   medical journal articles on INFUSE® authored by its physician consultants who received

23   significant amounts of money through royalties and consulting fees from MEDTRONIC.  The

24   company's significant role in authoring or substantively editing these articles was not disclosed in

25   the published articles.  Medical journals should ensure any industry role in drafting articles or

26   contributions to authors be fully disclosed.

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

278.   MEDTRONIC paid a total of approximately $210 million to physician authors of MEDTRONIC-sponsored studies from November 1996 through December 2010 for consulting, royalty and other arrangements.

279.   An e-mail exchange shows that a MEDTRONIC employee recommended against publishing a complete list of adverse events, or side effects, possibly associated with INFUSE® in a 2005 Journal of Bone and Joint Surgery article.

280.   MEDTRONIC officials inserted language into studies that promoted INFUSE® as a better technique than an alternative by emphasizing the pain associated with the alternative.

281.   Further Evidence of MEDTRONIC's Off-label Promotion.

282.   MEDTRONIC's knowledge and promotion of off-label use of INFUSE® is further evidenced by comparing sales of the rhBMP-2 component to the sales of the LT-Cage component (both components are required pursuant to FDA approval). On information and belief, MEDTRONIC sells the rhBMP-2 component separately from the LT-Cage™ in order to illegally and improperly promote off-label uses of INFUSE® in the lumbar spine and in the cervical spine, procedures in which the LT-Cage™ is not used.  As a result, sales of the rhBMP-2 component are and were at all relevant times far larger than sales of the LT-Cage™ component, despite FDA requirements that both be used according to the product's labeling; i.e. that the entire medical device (rhBMP-2 and the LT-Cage™) be used in the procedure.

283.   As described in detail above and throughout this Complaint, therefore, MEDTRONIC's off-label promotion of INFUSE® was not truthful.  Instead, MEDTRONIC's off-label promotion of INFUSE® was false and misleading. "Of course, off-label promotion that is false or misleading is not entitled to First Amendment protection." United States v. Caronia, No. 09-5006-cr , 2012 U.S. App. LEXIS 24831, at *39, n. 11(2d Cir., Dec. 3, 2012).

284.   MEDTRONIC's aggressive off-label promotion described above created the conditions for widespread acceptance by spine surgeons of the off-label uses of INFUSE® after the 2002 PMA approval, and MEDTRONIC's violations of federal law described above (which parallel Plaintiffs' state-law tort claims) directly caused or significantly contributed to the widespread off-label use of INFUSE® generally, and also specifically with respect to Plaintiff.  In

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

62

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

1  particular, MEDTRONIC's off-label promotion activities and failure to report adverse events

2  caused spine surgeons, including Plaintiff's surgeon to use INFUSE® in dangerous off-label

3  procedures.

4       **M.     Richard Eidson's Surgeries**

5       285.    On November 11, 2008, Plaintiff Richard Eidson underwent an L3-4 and L2-3

6  posterior lumbar interbody fusion and posterolateral fusion at John Muir Hospital in Walnut

7  Creek, California.  To achieve fusion, Plaintiff's surgeon, Jason Smith, M.D., performed an off-

8  label procedure by utilizing a posterior approach, by performing a multi-level fusion, and by using

9  INFUSE® without an LT Cage, and otherwise in a manner not approved by the FDA.

10      286.    MEDTRONIC Defendants, through their sales representatives and paid Key

11  Opinion Leaders and researchers, directly and indirectly promoted, trained, and encouraged

12  Plaintiff's surgeon to engage in an off-label procedure by implanting INFUSE® posteriorly, at

13  multiple levels, without an LT Cage, and in a manner otherwise not approved by the FDA.

14      287.    Following the November 11, 2008 surgery, plaintiff began experiencing new and

15  increased pain in his back and bilateral legs.  He also experience the onset of new leg weakness,

16  decreased leg sensation, and decreased reflexes in his legs.  On or around May 14, 2012, plaintiff

17  was diagnosed with fluid-filled cysts within the vertebral bodies where surgery had taken place at

18  L3-L4, which cysts had been present since at least November 21, 2011.  None of his symptoms

19  has resolved.

20      288.    Plaintiff now has severe low back pain, buttock pain, bilateral leg pain, and reduced

21  sensation, strength, and reflexes in his lower extremities. Plaintiff has never recovered from his

22  surgery involving INFUSE®, and he continues to have daily severe disabling pain that prevents

23  him from performing many basic activities of daily living.

24      **N.     Richard Eidson's Discovery of Defendant's Wrongdoing**

25      289.    Despite diligent investigation by Plaintiff into the cause of his injuries, including

26  numerous consultations with Mr. Eidson's medical providers, the nature of Plaintiff's injuries and

27  damages, and their relationship to INFUSE® was not discovered, and through reasonable care and

28  diligence could not have been discovered, until a date within the applicable statute of limitations

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

63

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

1   for filing Plaintiff's claims.  Defendants are estopped from asserting a statute of limitations

2   defense due to Defendants' fraudulent concealment, through affirmative misrepresentation and

3   omissions, from Plaintiff and Plaintiff's physicians of the true risks associated with INFUSE®.

4   As a result of Defendants' fraudulent concealment, Plaintiff was unaware, and could not have

5   known or have learned through reasonable diligence, that Plaintiff have been exposed to the risks

6   alleged herein and that those risks were the direct and proximate result of the wrongful acts and

7   omissions of the Defendants.

8                              **FIRST CAUSE OF ACTION**
                    **Fraudulent Misrepresentation and Fraud in the Inducement**
9

10          290.    Plaintiff incorporates by reference all previous and subsequent paragraphs of this

11  Complaint as if fully set forth here and further alleges as follows:

12          291.    In connection with their INFUSE® products, the MEDTRONIC Defendants

13  fraudulently and intentionally misrepresented material and important health and safety product

14  risk information from Plaintiff and Plaintiff's physicians, all as alleged in this Complaint.  Plaintiff

15  and Plaintiff's physicians would not have decided to use INFUSE® off-label by utilizing a

16  posterior approach, using INFUSE® at multiple levels, using INFUSE® without an LT Cage and

17  otherwise using it in a manner otherwise not approved by the FDA, had they known of the safety

18  risks related to INFUSE®.

19          292.    The MEDTRONIC Defendants marketed their INFUSE® product to and for the

20  benefit of Plaintiff, and marketed it to Plaintiff's physicians, and Defendants knew or had reason

21  to know of the unreasonable dangers and defects in their INFUSE® product, and that Plaintiff and

22  Plaintiff's physicians would use the product.

23          293.    Any of the following is sufficient to independently establish the MEDTRONIC

24  Defendants' liability for fraudulent misrepresentation and/or fraud in the inducement:

25          294.    The MEDTRONIC Defendants fraudulently concealed and misrepresented the

26  health and safety hazards, symptoms, constellation of symptoms, diseases and/or health problems

27  associated with the off-label use of INFUSE®;

28

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

64
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

295.    The MEDTRONIC Defendants fraudulently concealed and misrepresented their practice of promoting and marketing to physicians, including Plaintiff's physician, the practice of using of INFUSE® off-label by utilizing a posterior approach, using INFUSE® at multiple levels, using INFUSE® without an LT Cage and otherwise using it in a manner otherwise not approved by the FDA;

296.    The MEDTRONIC Defendants fraudulently concealed and misrepresented information about the known comparative risks and benefits of the use of INFUSE® and the relative benefits and availability of alternate products, treatments and/or therapies.

297.    The MEDTRONIC Defendants knew, or should have known, that they were concealing and misrepresenting true information about the known comparative risks and benefits of the use of INFUSE® and the relative benefits and availability of alternate products, treatments and/or therapies.

298.    The MEDTRONIC Defendants knew that Plaintiff and Plaintiff's physicians would regard the matters Defendants concealed and misrepresented to be important in determining the course of treatment for the Plaintiff, including Plaintiff and Plaintiff's physician's decision whether or not to use INFUSE®  off-label by utilizing a posterior approach, using INFUSE® at multiple levels, using INFUSE® without an LT Cage and otherwise using it in a manner otherwise not approved by the FDA.

299.    The MEDTRONIC Defendants intended to cause Plaintiff and Plaintiff's physicians to rely on their concealment of information and misrepresentations about the safety risks related to INFUSE® to induce them to make off-label use of INFUSE® for Plaintiff's lumbar spine fusion surgery.

300.    Plaintiff and Plaintiff's physicians were justified in relying, and did rely, on Defendants' concealment of information and misrepresentations about the safety risks related to INFUSE® in deciding to make off-label use of INFUSE® for lumbar spine fusion surgery.

301.    As the direct, proximate and legal cause and result of the Defendants' fraudulent concealment and misrepresentations and suppression of material health and safety risks relating to INFUSE® and Defendants' dangerous and irresponsible marketing and promotion practices,

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1    Plaintiff has been injured and has incurred damages, including but not limited to medical and

2    hospital expenses, lost wages and lost earning capacity, physical and mental pain and suffering,

3    and loss of the enjoyment of life.

4        302.    Plaintiff is therefore entitled to damages in an amount to be proven at trial, together

5    with interest thereon and costs.

6                              **SECOND CAUSE OF ACTION**
                          **Strict Products Liability – Failure To Warn**
7

8        303.    MEDTRONIC had a duty to warn Plaintiff and Plaintiff's physicians about the

9    dangers of INFUSE® which were known or knowable (in light of the state of the science at the

10   time) to MEDTRONIC.

11       304.    These dangers of off-label use of INFUSE®, including the dangers of bony

12   overgrowth, ectopic bone growth, cyst formation, subsidence, resorption, and resulting nerve

13   damage, were known or knowable (in light of the state of the science at the time) to

14   MEDTRONIC.

15       305.    Defendants, and each of them, knew that INFUSE® would be purchased and used

16   off-label without inspection for defects in the design of the product.

17       306.    The INFUSE® used in Plaintiff was defective for its intended off-label use when it

18   left the control of each of these Defendants.

19       307.    Defendants knew (or through the available scientific information could have

20   known) of the substantial dangers involved in the reasonably foreseeable and intended off-label

21   use of INFUSE®, including an unreasonably dangerous propensity to cause catastrophic injuries.

22       308.    MEDTRONIC failed to warn Plaintiff and Plaintiff's physicians of the dangers of

23   off-label use of INFUSE®, which use MEDTRONIC itself promoted.

24       309.    Plaintiffs have three theories upon which they allege a claim based on

25   MEDTRONIC'S failure to warn.

26           a.    First, MEDTRONIC breached its duty by overpromoting INFUSE® to

27   Plaintiff and Plaintiff's physicians for use in off-label procedures.

28

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

66
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

i.      In the course of unlawfully and deceptively promoting INFUSE®
for off-label use, MEDTRONIC made affirmative misrepresentations regarding the safety and
desirability of INFUSE® when used off-label.  MEDTRONIC'S overpromotion of INFUSE®
negated and nullified any warnings it had given to Plaintiff and Plaintiff's physicians,

ii.      Any warnings MEDTRONIC may have issued concerning the
dangers of off-label use of INFUSE® or regarding the risk of ectopic bone growth were
insufficient in light of MEDTRONIC'S contradictory prior, contemporaneous, and continuing
illegal promotional efforts and overpromotion of INFUSE® for non-FDA-approved off-label use,
and contemporaneous efforts to hide or downplay the true risks of off-label use of INFUSE®.

iii.      Through MEDTRONIC'S off-label overpromotion of INFUSE® to
Plaintiff and Plaintiff's physicians, which negated any warnings regarding off-label INFUSE®,
MEDTRONIC induced Plaintiff and Plaintiff's physicians to use INFUSE® off-label.

b.      Second, MEDTRONIC breached its duty in that, in the course of promoting
INFUSE® for off-label use (a use which the FDA had not reviewed or approved and for which the
FDA had not reviewed or approved any written warnings), MEDTRONIC both affirmatively
misrepresented and omitted information regarding the risks of the very off-label use
MEDTRONIC was promoting.  These misrepresentations and omissions included but were not
limited to the following:

i.      In the course of paying for, editing, influencing, and ghost-writing
studies regarding INFUSE®, MEDTRONIC used these studies to promote INFUSE® to the
medical community as a safe and efficacious drug.  Through these publications, which constituted
unlawful off-label promotion, MEDTRONIC failed to warn the medical community, including
Plaintiff's physicians, of the risks of INFUSE®, by concealing such risks through deliberate use of
methodological biases, withholding of information about adverse events, and reporting of adverse
events in a biased manner that did not attribute them to INFUSE®.

ii.      In the course of promoting INFUSE® for off-label use through
MEDTRONIC'S sales representatives (including but not limited to training surgeons to perform
off-label surgeries, advising surgeons during off-label surgeries, participating in off-label

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1   surgeries, urging surgeons to use INFUSE® off-label during their surgeries, telling surgeons about

2   their peers' positive experiences with INFUSE®, and reassuring surgeons regarding complications

3   they experienced during off-label use), MEDTRONIC made affirmative, favorable representations

4   regarding off-label use of INFUSE®, yet failed and omitted to warn regarding the attendant risks

5   of off-label use of INFUSE®.

6            c.      Third, MEDTRONIC breached its duty in that it failed to warn Physicians

7   by failing to communicate the growing number of adverse events to the FDA from 2002 to 2011,

8   as it was required to do by federal law.  This claim mirrors the claim approved by the Ninth

9   Circuit in *Stengel v. MEDTRONIC,* 704 F.3d 1224 (9th Cir. 2013).

10                  i.      The FDCA requires medical device manufacturers to maintain and

11  submit information as required by regulation, 21 U.S.C. § 360i, including submitting adverse

12  event reports, 21 C.F.R. § 803.50, and establishing internal procedures for reviewing complaints

13  and event reports. 21 C.F.R. § 820.198(a).

14                  ii.     By April 2008, over 500,000 surgeries had been performed using

15  INFUSE.  Spinal fusions accounted for 92.8 percent of these procedures.  Approximately 95% of

16  these were for off-label uses.

17                  iii.    According to the above-described analysis conducted by Dr. Eugene

18  Carragee, et al. (*The Spine Journal*, June 2011) the true rate of adverse events related to

19  INFUSE® was between 10 to 50%, meaning that, by April 2008, there had been approximately

20  50,000 to 250,000 adverse events involving INFUSE®.

21                  iv.     Most of these adverse events were associated with off-label use.

22  Emily Woo, M.P.H., a current FDA employee, published an article in *The Spine Journal* in 2012

23  showing that greater than 98% of all adverse events involving INFUSE® are due to off-label use.

24                  v.      Nevertheless, by the end of April 2008, only 262 total adverse

25  events involving INFUSE® had been reported to the FDA.  By August 2011, approximately 844

26  adverse events involving INFUSEv in spinal surgeries had been reported to the FDA.  This

27  reflects vast underreporting of adverse events.

28

LAW OFFICES OF
**WALKUP, MELODIA, KELLY**
**& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

68
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

1     vi.     From 2002 to 2008, MEDTRONIC sales representatives personally

2   attend the majority of INFUSE® surgeries, including off-label INFUSEv surgeries, and worked

3   closely with implanting surgeons on an ongoing basis.  Thus, on information and belief, the vast

4   majority of adverse events were known or knowable to MEDTRONIC.

5     vii.     There are specific known occasions in which MEDTRONIC was

6   explicitly aware of an adverse events involving INFUSE®, which a surgeon attributed to

7   INFUSE®, and MEDTRONIC took no steps to report such adverse event to the FDA.

8     viii.     The FDA maintains a MAUDE database on reported adverse events,

9   which is a public database known to, and discussed in, the medical community, including

10  Plaintiff's physicians.

11    ix.     MEDTRONIC affirmatively advertised the absence of adverse

12  events to surgeons, on information and belief including plaintiff's surgeon.

13    x.     If MEDTRONIC had communicated adverse events to the FDA as

14  required by law, this would have effectively warned plaintiff's surgeon of those adverse events –

15  both directly and through the discussion of those adverse events that would have followed in the

16  literature and at meetings plaintiff's surgeon attended.

17    310.   In the course of these overpromotions, misrepresentations, omissions, and

18  underreporting of adverse events, MEDTRONIC failed to adequately warn Plaintiff and Plaintiff's

19  physicians, in light of its scientific and medical knowledge at the time, of the dangers associated

20  with INFUSE® when used off-label, including, but not limited to, pain and weakness in limbs,

21  loss of sensation, radiculitis, subsidence, ectopic bone formation, osteolysis, and poorer global

22  outcomes than alternative treatments.

23    311.   In the course of these overpromotions, misrepresentations, omissions, and

24  underreporting, MEDTRONIC failed to provide the level of information that an ordinary

25  physician or consumer would expect when using INFUSE®  in an off-label manner that had been

26  encouraged by, and was thus reasonably foreseeable to MEDTRONIC.  MEDTRONIC minimized

27  and/or downplayed the risks of serious side effects related to the off-label use of INFUSE®,

28  including, but not limited to, pain and weakness in limbs, loss of sensation, radiculitis, subsidence,

LAW OFFICES OF
**WALKUP, MELODIA, KELLY**
**& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

69

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

ectopic bone formation, osteolysis, and poorer global outcomes than alternative treatments.

312.    Defendants knew that these dangers were not readily recognizable to an ordinary patient or physicians, and that patients and physicians would purchase INFUSE® for off-label use without inspection.

313.    At the time of Plaintiff's injury, INFUSE® was being used in a manner promoted by Defendants, and in a manner that was reasonably foreseeable by Defendants as involving substantial danger that was not readily apparent to its users.

314.    Plaintiff's physician were justified in relying and did rely on MEDTRONIC'S off-label overpromotion, off-label misrepresentations, and attendant concealments and absence of reported adverse events, in deciding to use INFUSE® in an off-label manner.  Plaintiff and Plaintiff's physician would not have made used INFUSE® off-label by utilizing a posterior approach, using INFUSE for an off-label indication, and by using INFUSE® without an LT Cage and in a manner otherwise not approved by the FDA had they known of the true safety risks related to INFUSE®.

315.    As a direct and proximate result of one or more of the above-listed dangerous conditions and defects, and of MEDTRONIC'S failure to provide adequate warnings about them, Plaintiff sustained serious injuries of a personal and pecuniary nature.

316.    Plaintiff has sustained extreme pain, suffering, and anguish from the date of Plaintiff's lumbar spine fusion surgery in which INFUSE® was implanted until the present.

317.    Plaintiff is therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

**THIRD CAUSE OF ACTION**
**Negligent Misrepresentation**

318.    Plaintiff incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth here and further alleges as follows:

319.    Defendants marketed their INFUSE® product to and for the benefit of Plaintiff, and additionally marketed it to Plaintiff's physicians, and these Defendants knew or should have known that Plaintiff and Plaintiff's physicians would use their product, including for the off-label

LAW OFFICES OF
**WALKUP, MELODIA, KELLY**
**& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

1  use of INFUSE® without an LT-Cage®  and the placement of  INFUSE® medially and laterally

2  to a non-FDA approved cage in lumbar spine fusion.

3       320.    Defendants owed Plaintiff and Plaintiff's physicians duties to exercise reasonable

4  or ordinary care under the circumstances in light of the generally recognized and prevailing best

5  scientific knowledge.

6       321.    Misrepresentations made by Defendants about the safety of off-label INFUSE®

7  independently imposed a duty upon Defendants to fully and accurately disclose to Plaintiff and

8  Plaintiff's physicians the true health and safety risks related to INFUSE®, and a duty to disclose

9  their dangerous and irresponsible off-label promotion and marketing practices.

10       322.    Through the conduct described in the foregoing and subsequent paragraphs of this

11  Complaint, Defendants breached their duties to Plaintiff and to Plaintiff's physicians.

12       323.    MEDTRONIC failed to exercise reasonable care to prevent INFUSE® from

13  creating an unreasonable risk of harm to Plaintiff and other consumers who might reasonably be

14  expected to be harmed by INFUSE® while it was being used in the manner the MEDTRONIC

15  Defendants should have reasonably expected, in that MEDTRONIC negligently and affirmatively

16  misrepresented to Plaintiff and Plaintiff's physicians the true risks of INFUSE®.

17       324.    MEDTRONIC failed to exercise reasonable care to prevent INFUSE® from

18  creating an unreasonable risk of harm to Plaintiff and other consumers who might reasonably be

19  expected to be harmed by INFUSE® while it was being used in the manner the MEDTRONIC

20  Defendants should have reasonably expected, in that while it affirmatively promoted INFUSE®

21  for off-label use, MEDTRONIC negligently omitted information regarding the risks of the very

22  off-label use it was promoting.

23       325.    MEDTRONIC negligently misrepresented the risks of off-label INFUSE® in the

24  following ways:

25            a.    In the course of paying for, editing, influencing, and ghost-writing studies

26  regarding INFUSE®, MEDTRONIC used these studies to promote INFUSE® to the medical

27  community as a safe and efficacious drug.  Through these publications, which constituted

28  unlawful off-label promotion, MEDTRONIC failed to warn the medical community, including

LAW OFFICES OF
**WALKUP, MELODIA, KELLY**
**& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

71

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

Plaintiff's physicians, of the risks of INFUSE®, by concealing such risks through deliberate use of methodological biases, withholding of information about adverse events, and reporting of adverse events in a biased manner that did not attribute them to INFUSE®.

b. In the course of promoting INFUSE® for off-label use through MEDTRONIC'S sales representatives (including but not limited to training surgeons to perform off-label surgeries, advising surgeons during off-label surgeries, participating in off-label surgeries, urging surgeons to use INFUSE® off-label during their surgeries, telling surgeons about their peers' positive experiences with INFUSE®, and reassuring surgeons regarding complications they experienced during off-label use), MEDTRONIC made affirmative, favorable representations regarding off-label use of INFUSE®, yet failed and omitted to warn regarding the attendant risks of off-label use of INFUSE®.

326. Defendants knew, or should have known, that, due to their failure to use reasonable care, Plaintiff and Plaintiff's physicians would use and did use INFUSE® in a dangerous, experimental, off-label manner that MEDTRONIC had promoted, to the detriment of Plaintiff's health, safety and well-being.

327. As the direct, proximate and legal result of the Defendants' negligent misrepresentations and omissions, Plaintiff has suffered and will suffer severe physical pain, medical and hospital expenses, lost wages, pain and suffering, and pecuniary loss.

328. Plaintiff is therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

**FOURTH CAUSE OF ACTION**
**Negligent Failure to Warn**

329. Plaintiff incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth here and further alleges as follows:

330. MEDTRONIC had a duty to warn Plaintiff and Plaintiff's physicians about the dangers of INFUSE® of which it knew, or in the exercise of ordinary care, should have known, at the time the INFUSE® left the Defendants' control.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

72
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

331.   The MEDTRONIC Defendants knew or should have known of these dangers of off-label use of INFUSE®, including the dangers of bony overgrowth, ectopic bone growth cyst formation, subsidence, resorption, and resulting nerve damage, which it knew or should have known were associated with the use of rhBMP-2 without an LT-Cage, and in posterior surgical approaches, at multiple levels.

332.   Defendants, and each of them, knew that INFUSE® would be purchased and used off-label without inspection for defects in the design of the product.

333.   The INFUSE® used in Plaintiff was defective for its intended off-label use when it left the control of each of these Defendants.

334.   Defendants knew or should have known of the substantial dangers involved in the reasonably foreseeable and intended off-label use of INFUSE®, including an unreasonably dangerous propensity to cause catastrophic injuries.

335.   MEDTRONIC failed to warn Plaintiff and Plaintiff's physicians of the dangers of off-label use of INFUSE®, which use MEDTRONIC itself promoted.

336.   Plaintiffs have three theories upon which they allege a claim based on MEDTRONIC'S negligent failure to warn.

a.   First, MEDTRONIC breached its duty by overpromoting INFUSE® to Plaintiff and Plaintiff's physicians for use in off-label procedures.

i.   In the course of unlawfully and deceptively promoting INFUSE® for off-label use, MEDTRONIC made affirmative misrepresentations regarding the safety and desirability of INFUSE® when used off-label.  MEDTRONIC'S overpromotion of INFUSE® negated and nullified any warnings it had given to Plaintiff and Plaintiff's physicians,

ii.   Any warnings MEDTRONIC may have issued concerning the dangers of off-label use of INFUSE® or regarding the risk of ectopic bone growth were insufficient in light of MEDTRONIC'S contradictory prior, contemporaneous, and continuing illegal promotional efforts and overpromotion of INFUSE® for non-FDA-approved off-label use, and contemporaneous efforts to hide or downplay the true risks of off-label use of INFUSE®.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

73
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

iii.     Through MEDTRONIC'S off-label overpromotion of INFUSE® to Plaintiff and Plaintiff's physicians, which negated any warnings regarding off-label INFUSE®, MEDTRONIC induced Plaintiff and Plaintiff's physicians to use INFUSE® off-label.

b.     Second, MEDTRONIC breached its duty in that, in the course of promoting INFUSE® for off-label use (a use which the FDA had not reviewed or approved and for which the FDA had not reviewed or approved any written warnings), MEDTRONIC both affirmatively misrepresented and omitted information regarding the risks of the very off-label use MEDTRONIC was promoting.  These misrepresentations and omissions included but were not limited to the following:

i.     In the course of paying for, editing, influencing, and ghost-writing studies regarding INFUSE®, MEDTRONIC used these studies to promote INFUSE® to the medical community as a safe and efficacious drug.  Through these publications, which constituted unlawful off-label promotion, MEDTRONIC failed to warn the medical community, including Plaintiff's physicians, of the risks of INFUSE®, by concealing such risks through deliberate use of methodological biases, withholding of information about adverse events, and reporting of adverse events in a biased manner that did not attribute them to INFUSE®.

ii.     In the course of promoting INFUSE® for off-label use through MEDTRONIC'S sales representatives (including but not limited to training surgeons to perform off-label surgeries, advising surgeons during off-label surgeries, participating in off-label surgeries, urging surgeons to use INFUSE® off-label during their surgeries, telling surgeons about their peers' positive experiences with INFUSE®, and reassuring surgeons regarding complications they experienced during off-label use), MEDTRONIC made affirmative, favorable representations regarding off-label use of INFUSE®, yet failed and omitted to warn regarding the attendant risks of off-label use of INFUSE®.

c.     Third, MEDTRONIC breached its duty in that it failed to warn Physicians by failing to communicate the growing number of adverse events to the FDA from 2002 to 2011, as it was required to do by federal law.  This claim mirrors the claim approved by the Ninth Circuit in *Stengel v. MEDTRONIC,* 704 F.3d 1224 (9th Cir. 2013).

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

i.      The FDCA requires medical device manufacturers to maintain and submit information as required by regulation, 21 U.S.C. § 360i, including submitting adverse event reports, 21 C.F.R. § 803.50, and establishing internal procedures for reviewing complaints and event reports. 21 C.F.R. § 820.198(a).

ii.      By April 2008, over 500,000 surgeries had been performed using INFUSE.  Spinal fusions accounted for 92.8 percent of these procedures.  Approximately 95% of these were for off-label uses.

iii.      According to the above-described analysis conducted by Dr. Eugene Carragee, et al. (*The Spine Journal*, June 2011) the true rate of adverse events related to INFUSE was between 10 to 50%, meaning that, by April 2008, there had been approximately 50,000 to 250,000 adverse events involving INFUSE®.

iv.      Most of these adverse events were associated with off-label use. Emily Woo, M.P.H., a current FDA employee, published an article in *The Spine Journal* in 2012 showing that greater than 98% of all adverse events involving INFUSE® are due to off-label use.

v.      Nevertheless, by the end of April 2008, only 262 total adverse events involving INFUSE® had been reported to the FDA.  By August 2011, approximately 844 adverse events involving INFUSE® in spinal surgeries had been reported to the FDA.  This reflects vast underreporting of adverse events.

vi.      From 2002 to 2008, MEDTRONIC sales representatives personally attend the majority of INFUSE® surgeries, including off-label INFUSE® surgeries, and worked closely with implanting surgeons on an ongoing basis.  Thus, on information and belief, they knew or should have known of the vast majority of adverse events.

vii.      There are specific known occasions in which MEDTRONIC was explicitly aware of an adverse events involving INFUSE®, which a surgeon attributed to INFUSE®, and MEDTRONIC took no steps to report such adverse event to the FDA.

viii.      The FDA maintains a MAUDE database on reported adverse events, which is a public database known to, and discussed in, the medical community, including Plaintiff's physicians.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

75
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

1        ix.  MEDTRONIC affirmatively advertised the absence of adverse

2 events to surgeons, on information and belief including plaintiff's surgeon.

3        x.  If MEDTRONIC had communicated adverse events to the FDA as

4 required by law, this would have effectively warned plaintiff's surgeon of those adverse events –

5 both directly and through the discussion of those adverse events that would have followed in the

6 literature and at meetings plaintiff's surgeon attended.

7    337.  In the course of these overpromotions, misrepresentations, omissions, and

8 underreporting of adverse events, MEDTRONIC failed to adequately warn Plaintiff and Plaintiff's

9 physicians of the dangers associated with INFUSE® when used off-label, including, but not

10 limited to, pain and weakness in limbs, loss of sensation, radiculitis, subsidence, ectopic bone

11 formation, osteolysis, and poorer global outcomes than alternative treatments – all of which

12 MEDTRONIC knew or should have known.

13    338.  In the course of these overpromotions, misrepresentations, omissions, and

14 underreporting, MEDTRONIC failed to provide the level of information that an ordinary

15 physician or consumer would expect when using INFUSE®  in an off-label manner that had been

16 encouraged by, and was thus reasonably foreseeable to MEDTRONIC.  MEDTRONIC either

17 negligently, recklessly, or intentionally minimized and/or downplayed the risks of serious side

18 effects related to the off-label use of INFUSE®, including, but not limited to, pain and weakness

19 in limbs, loss of sensation, radiculitis, subsidence, ectopic bone formation, osteolysis, and poorer

20 global outcomes than alternative treatments – all which were risks of which it knew or should

21 have known.

22    339.  Defendants knew that these dangers were not readily recognizable to an ordinary

23 patient or physicians, and that patients and physicians would purchase INFUSE® for off-label use

24 without inspection.

25    340.  At the time of Plaintiff's injury, INFUSE® was being used in a manner promoted

26 by Defendants, and in a manner that was reasonably foreseeable by Defendants as involving

27 substantial danger that was not readily apparent to its users.

28

LAW OFFICES OF
**WALKUP, MELODIA, KELLY**
**& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

76
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

341.    Plaintiff's physician were justified in relying on and did rely on MEDTRONIC'S off-label overpromotion, off-label misrepresentations, and attendant concealments and absence of reported adverse events, in deciding to use INFUSE® in an off-label manner.  Plaintiff and Plaintiff's physician would not have made used INFUSE® off-label by utilizing a posterior approach, using INFUSE® for an off-label indication, and by using INFUSE® without an LT Cage and in a manner otherwise not approved by the FDA had they known of the true safety risks related to INFUSE®.

342.    As the direct, proximate and legal result of the Defendants' negligent misrepresentations and omissions, Plaintiff has suffered and will suffer severe physical pain, medical and hospital expenses, lost wages, pain and suffering, and pecuniary loss.  Plaintiff is therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

**ADDITIONAL ALLEGATIONS REGARDING CLAIM FOR PUNITIVE DAMAGES**

343.    Plaintiff incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth here and further alleges as follows: At all times herein referenced, officers, directors, and managing agents of MEDTRONIC knew of, and were aware of, and concealed, hid, and/or otherwise downplayed the true risks of non-FDA approved off-label uses of its product INFUSE®.

344.    At all times herein referenced, officers, directors, and managing agents of MEDTRONIC knew, and were aware, that numerous people had pain and weakness in limbs, loss of sensation, radiculitis, subsidence, ectopic bone formation, cyst formation, and poorer global outcomes than alternative treatments. as a result of non-FDA approved off-label uses of its product INFUSE®.

345.    The MEDTRONIC defendants designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold  INFUSE®, a product which said Defendants knew to be dangerous and unsafe for the purpose for which they intended it to be used, namely, as a bio-engineering bone draft device in spinal fusion surgeries.

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

77
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

346.    At all times herein mentioned, prior to and at the time that Defendants designed, manufactured, promoted, marketed, supplied, distributed, and/or sold INFUSE® to Plaintiff, and prior to the time that said product was used, the Defendants knew, or should have known, that INFUSE®  was defectively designed and manufactured, that it had extremely dangerous properties and defects, and that it had defects which would cause serious injuries and damage to users of said product, thereby threatening the life and health of the users.  Further, at all times, all Defendants knew that INFUSE® had caused serious injuries and damage to other members of the public.

347.    At all times herein mentioned, all Defendants, despite the actual knowledge described hereinabove, intentionally suppressed the aforementioned complaints, actively concealed and downplayed the risks associated with INFUSE®, actively promoted the illegal, off-label use of INFUSE®, failed to warn Plaintiff and the medical community of the true risks associated with INFUSE®, and saturated the scientific and medical literature with biased, industry-funded studies to conceal the true risks of INFUSE®, and otherwise failed to warn Plaintiff, the medical community, and/or the general public.

348.    At all times herein mentioned, Defendants had actual knowledge of the facts hereinabove alleged demonstrating that serious injury to patients in which INFUSE® was implanted, particularly in an off-label manner such as posterior lumbar fusion surgery Plaintiff underwent.  Defendants nevertheless deliberately suppressed, concealed, downplayed, and/or otherwise hid any information demonstrating the true risks associated with INFUSE® from Plaintiff, the medical community, and/or the general public. Instead, Defendants continued to actively promote the illegal, off-label use of INFUSE® to spine surgeons in an effort to maintain INFUSE®'s enormous profitability.

349.    As a legal and proximate result of Defendants' conduct, as herein alleged, Plaintiff sustained the injuries and damages set forth above.

350.    Defendants' conduct, as set forth above, in allowing such an extremely dangerous product to be used by members of the general public, including Plaintiff, constitutes fraud, malice and oppression toward Plaintiff and others, and a conscious disregard of the safety of Plaintiff and

LAW OFFICES OF
**WALKUP, MELODIA, KELLY**
**& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

others.

351.    Plaintiff is therefore entitled to exemplary or punitive damages, which would serve to punish the Defendants and to deter wrongful conduct in the future.

352.    Plaintiff is therefore entitled to judgment against Defendants as hereinafter set forth.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests of this Court the following relief:

A.    For general damages, in an amount to be proven at the time of trial;

B.    For medical, incidental, hospital, psychological care and other expenses, in an amount to be proven at the time of trial;

C.    For loss of earnings and earning capacity, in an amount to be proven at the time of trial;

D.    For an award of pre-judgment and post-judgment interest as provided by law;

E.    For consequential damages, in an amount to be proven at the time of trial;

F.    For exemplary or punitive damages against Defendants MEDTRONIC, INC. and MEDTRONIC SOFAMOR DANEK USA, INC. as provided by law;

G.    For an award providing for payment of costs of suit; and

H.    For such other and further relief as this Court may deem just and proper.

Dated:  November 15, 2013                    WALKUP, MELODIA, KELLY & SCHOENBERGER


                                             /s/ Khaldoun A. Baghdadi
                                             KHALDOUN A. BAGHDADI
                                             Attorneys for Plaintiffs

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK

1

## DEMAND FOR JURY TRIAL

2

Plaintiff demands a trial by jury on all issues stated.

3

Dated:  November 15, 2013                    WALKUP, MELODIA, KELLY & SCHOENBERGER

4

5

6                                      /s/ Khaldoun A. Baghdadi
                                       KHALDOUN A. BAGHDADI
7                                      Attorneys for Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

80
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. CV 13 2049 LHK